THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RUDY KLOIBER, Defendant-Appellant.

Third District    No. 80-282

Opinion filed May 11, 1981.—Rehearing denied June 1, 1981.

Robert Agostinelli and G. Joseph Weller, both of State Appellate Defender's Office, of Ottawa, for appellant.

James T. Teros, State's Attorney, of Rock Island (John X. Breslin and Rita F. Kennedy, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE SCOTT delivered the opinion of the court:

The defendant, Rudy Kloiber, was convicted of murder and armed robbery following a jury trial in the Circuit Court of Rock Island County. The defendant was sentenced to the Department of Corrections for a term of natural life on his murder conviction. No sentence was imposed following his armed robbery conviction.

The defendant raises several issues on appeal. Prior to reviewing each of the issues presented for review, it is necessary to discuss the factual context from which the defendant's conviction occurred and this appeal is taken.

On November 18, 1979, the defendant was employed as a maintenance man at the Plantation restaurant in Moline, Illinois, when the owner of the Plantation, Nicholas J. Chirekos, was murdered.

The State's evidence indicated a hostess at the restaurant heard two gunshots at approximately 1:50-1:55 a.m. on the night of the murder. The shots appeared to have come from the upstairs office of the restaurant where Mr. Chirekos had taken the nightly receipts. The hostess' husband, an ex-police officer, was waiting in the parking lot for his wife and verified the time and place of the shooting.

The Moline Police Department was notified to report to the Plan-

tation at 2:08 a.m. and officers arrived there at approximately 2:15 a.m. They found the door to Chirekos' office locked and had to gain entrance by means of the manager's key. Inside they found Chirekos lying on the floor and discovered that one of the side panels of a window air conditioner had been removed.

Detectives later discovered several items which were admitted into evidence, including a block of cement ledge from outside of Chirekos' office, and in the cement were footprints pointing toward the office. It was the opinion of a forensic scientist that the footprints matched the tennis shoes worn by the defendant at the time of his arrest. Several witnesses testified as to having observed the defendant working on the roof of the Plantation not long before the incident.

According to police investigators, Chirekos' office had not been ransacked and there was no evidence of a struggle. Chirekos' body was described as being in an "assumed" or "orderly" position. There were no finger prints of significance found at the scene or on the various exhibits.

A pathologist testified that Chirekos suffered two bullet wounds in his head, one of which penetrated the skull and was the cause of death. The shots had apparently been fired through a cloth bag which was found at the scene. A forensic scientist examined the bullets and determined them to be .25-caliber ammunition. He also determined that the eight holes in the cloth bag were bullet holes. A box for a .25-caliber pistol was discovered in an apartment shared by the defendant, Clarence Phelps and Georgia Heaslip, Phelps' fiance. Phelps testified that he owned such a weapon; however, it was never found by the police.

The key witness for the State was Clarence Phelps, who was the chef at the Plantation restaurant and the defendant's roommate. The police turned up the names of Phelps and the defendant as suspects during an interview with Plantation employees, and, as a consequence, Phelps was arrested at his apartment the morning after the crime and was charged with murder. The defendant was not arrested until the following day, November 19, 1979.

Phelps was questioned by police after his arrest but he denied any involvement in the murder of Chirekos. He was interrogated again the next day and continued to deny any direct involvement in the crime itself, but he admitted having helped the defendant dispose of materials connected with the robbery. The charge against Phelps was subsequently changed from murder to aiding a fugitive, a charge which was pending against him when he appeared as a witness for the State at the defendant's trial.

Phelps testified that the defendant left the apartment sometime after midnight to go for a drink. According to Phelps, the defendant returned shortly after 2 a.m. and announced in a loud voice that he needed assis-

tance because he was having some problems with three men at a bar called the Glass Rainbow. Then, in a quieter voice, unheard by Heaslip, he informed Phelps that he had killed Chirekos, *i.e.*, "skeeted the old man." Phelps admitted that, afterward, he helped the defendant sort out the loot and dispose of unwanted material at a marina. The defendant also explained to Phelps how the crime was committed. Specifically, Phelps testified that the defendant told him that he entered through the window at the same time Chirekos walked into his office and that he shot Chirekos twice in the head after ordering him to lie down on the floor. The defendant was in possession of Phelps' gun. Phelps claimed that he did not give the foregoing story to the police right away because he was afraid of the defendant.

Acting upon the information provided by Phelps, the police made a search of the area around the Rock Island Sunset Marina where they found a number of items—including bank bags, receipts, and register tapes from the Plantation restaurant.

The prosecution also called Phelps' fiance, Georgia Heaslip, to the stand in support of Phelps' testimony that the defendant returned to their apartment at 2:15 a.m. and that Phelps had been in bed with her during the time the defendant was absent. Heaslip acknowledged that she was the one who purchased the gun for Phelps which the defendant allegedly used in the commission of the charged offenses.

In addition, Heaslip recounted the events immediately prior to the defendant's arrest on November 19, 1979. She stated that he suddenly reappeared at their apartment and changed his clothes while she called the police. The defendant was arrested at the apartment in response to Heaslip's call.

At the police station, the defendant was interrogated and stated that he had been at the Glass Rainbow at the time of the murder and that he had been drinking and driving around the Quad Cities during the 24-hour period prior to his arrest.

The interrogation of the defendant resumed later, but the defendant continued to profess his innocence. However, when the defendant was confronted with the statement given by Phelps, he reacted by saying, "that is a very interesting story," followed by "it is all right there" upon being asked for his own version. Finally, the defendant was asked if Phelps' statement was true, and he replied with such words as "it is true" and "you've got it all there." The interrogation continued in this fashion but it ended without a formal statement having been made by the defendant.

The defendant also made statements to other individuals which were used against him at trial.

To a fellow inmate at the Rock Island County Jail, Robert Nichols,

the defendant was alleged to have said, "they are looking in the wrong place" while watching a news report of the police search at the Sunset Marina. The defendant also told Nichols that he got $10,000 from the robbery. None of the other eight or nine inmates in the cell block heard these statements. Nichols had been convicted of attempted burglary and forgery. It was brought out during the cross-examination of Nichols by the public defender that Nichols had recently agreed to testify against another man in connection with the forgery charge for which he was incarcerated. On redirect examination it was further revealed that the public defender had also acted as defense counsel for Nichols and had negotiated the plea and sentence which Nichols was serving at the time of the defendant's trial. The public defender made no objection to this line of questioning. The prosecutor again referred to the public defender's representation of Nichols in closing argument, without an objection by the public defender.

Other statements by the defendant were made to a correctional officer at the jail, who testified that the defendant offered him $1,000 for his help. The officer related that he reported the offer to his superiors and thereafter engaged the defendant in repeated discussions on the matter. Eventually, the defendant gave him a written list of wanted articles and a piece of paper with some directions written on it. A sheriff's investigator followed the directions on the paper and was led to a bridge along I-74, between the Quad Cities and Peoria. Under the bridge he found a box containing $356.84 in coins. Phelps had testified that he saw "a lot of change" in the defendant's possession after the robbery/murder. The manager of the Plantation testified that they would have approximately $600 in coins on a Saturday night at the restaurant.

In response to the foregoing evidence, an alibi defense was asserted on the defendant's behalf. A cocktail waitress at the Glass Rainbow disco-bar in East Moline testified that the defendant came in sometime between 11:30 p.m. and 12:30 a.m. and that he left between 1 a.m. and 2 a.m. The defense then presented evidence that the Glass Rainbow is 6.1 miles from the Plantation and 2 miles from the defendant's apartment. An investigator with the public defender's office testified that it takes from 11 to 18 minutes to drive from the defendant's apartment to the Plantation and 15 minutes to drive to the Plantation from the Glass Rainbow.

The presentation of evidence concluded with the testimony of a rebuttal witness for the prosecution, a detective, who stated that he drove from the defendant's apartment to the Plantation in 9 minutes.

At the instruction conference the defense tendered an accomplice instruction which was refused on the theory that Phelps was not actually an accomplice but was rather an accessory after the fact.

Defendant's first issue on appeal contends the trial court erred by

refusing to give the accomplice instruction (IPI Criminal No. 3.17) tendered by defense counsel. The instruction is as follows:

"An accomplice witness is one who testifies that he was involved in the commission of a crime with the defendant. The testimony of an accomplice witness is subject to suspicion, and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

The test for determining whether or not one is an accomplice is whether the witness could have been indicted for the offense, either as a principal or an accessory. (*People v. Hrdlicka* (1931), 344 Ill. 211, 176 N.E. 308.) The term "accomplice" cannot be used in a loose or popular sense so as to embrace one who has guilty knowledge or is morally delinquent or who was even an admitted participant in a related but nevertheless distinct offense. To be an accomplice, "he must take some part, perform some act or owe some duty to the person in danger that makes it incumbent on him to prevent the commission of the crime." *Hrdlicka*, 344 Ill. 211, 222, 176 N.E. 308, 313. See also *People v. Robinson* (1974), 59 Ill. 2d 184, 319 N.E.2d 772; *People v. Mason* (1978), 61 Ill. App. 3d 918, 378 N.E.2d 384.

Turning to the facts of the case at bar, it is clear that probable cause did not exist to believe that Phelps was guilty of murder or armed robbery as either a principal or accessory. The fact that Phelps may have been initially charged by the police with the murder of Chirekos does not necessarily mean that he could have been successfully indicted for the offense. Phelps testified that he did not aid the defendant in the robbery and murder of Chirekos and did not know the defendant had taken his gun to use in committing the offenses. The defendant admitted to the police that Phelps' account of the robbery/murder was correct. Heaslip also corroborated Phelps' testimony that he was not involved in the murder. Thus, the evidence established that Phelps was an accessory after the fact. The trial court was therefore correct in refusing to give the accomplice instruction tendered by defense counsel.

The second issue raised on appeal is whether the defendant should be granted a new trial because his appointed attorney had formerly represented a State's witness. Although the State's witness testified after he had been sentenced in an unrelated case (forgery), the defendant now raises for the first time on appeal that he was denied effective assistance of counsel.

The State contends that since the defendant failed to raise the conflict of interest issue in the trial court, he has waived consideration of the issue on appeal. (*People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227.) However, we must hold as we did in *People v. Sally* (1980), 84 Ill. App. 3d 167, 405 N.E.2d 407, that the waiver rule of *Precup* cannot apply since there

was no post-trial review by an independent attorney. See also *People v. Hunt* (1979), 73 Ill. App. 3d 1034, 392 N.E.2d 793; *People v. Arreguin* (1981), 92 Ill. App. 3d 899, 416 N.E.2d 402.

We will therefore address ourselves to the allegation that the defendant was denied effective assistance of counsel due to an alleged conflict of interest because the public defender appointed to represent the defendant had previously represented one of the State's witnesses on an unrelated charge who had been called upon to testify as to certain incriminating statements allegedly made by the defendant to the witness while both resided in the county jail.

■■ A *per se* conflict of interest exists when counsel represents a defendant and a State's witness at the *same* time. (*People v. Stoval* (1968), 40 Ill. 2d 109, 239 N.E.2d 441.) However, no such conflict of interest exists when counsel has terminated his representation of the State's witness. *Jeffers v. United States* (7th Cir. 1975), 520 F.2d 1256, *cert. denied* (1976), 423 U.S. 1066, 46 L. Ed. 2d 656, 96 S. Ct. 805; see also *People v. Robinson* (1979), 79 Ill. 2d 147, 402 N.E.2d 157; *People v. Hunt* (1979), 73 Ill. App. 3d 1034, 392 N.E.2d 793.

In the case at bar, the public defender had clearly terminated his representation of Robert Nichols prior to trial. Nichols testified that he was convicted of attempt (burglary) and forgery and sentenced to two years probation with the condition that he serve 90 days in the county jail. Nichols' sentence commenced in December of 1979 and he was incarcerated with the defendant when the alleged statements were made by the defendant to him.

The crimes for which Nichols was incarcerated were unrelated to the offense for which the defendant was charged and therefore, even the *possibility* of antagonistic defenses did not exist, *i.e.*, the interests of Nichols and the defendant were not conflicting. The instant trial did not occur until April of 1980. Thus, the public defender had no attorney-client relationship with Nichols at the time of defendant's trial.

Since the public defender no longer represented Nichols, no conflict of interest existed. The public defender had no pecuniary interest in Nichols since he was employed as a public defender. The public defender also effectively cross-examined Nichols in the case at bar. A reading of the transcript of the cross-examination establishes that the public defender challenged Nichols' testimony because Nichols had previously agreed to testify for the State in connection with the forgery in return for leniency. The cross-examination also disclosed the fact that Nichols had been AWOL from the army, was the only person in jail who heard the defendant's admissions, and failed to immediately report the defendant's admissions to the authorities.

Since no attorney-client relationship existed between the public

defender and Nichols at the time of trial, no conflict of interest existed. The defendant has failed to establish either that the public defender was hampered in his cross-examination of Nichols or that the public defender's representation of the defendant was ineffective.

Our reliance on the cases of *Jeffers* and *Robinson* is particularly important due to defendant's allegation that we should govern our opinion by the decision in *People v. Drysdale* (1977), 51 Ill. App. 3d 667, 366 N.E.2d 394.

In *Jeffers*, the defendant was represented by an attorney whose firm had represented a prosecution witness in an earlier criminal trial. In holding that the defense counsel's dual representation did not constitute a conflict of interest, the court of appeals emphasized that the case did not involve "an existing personal relationship" between the attorney and the prosecution witness. (520 F.2d 1256, 1263-64.) By contrast, in *Robinson* the relationship between attorney and client was active in that at the time of defendant's trial the prosecution witness (tavern owner) still owed legal fees to the assistant public defender as a result of the attorney's representation of the owner of the tavern in acquiring the property prior to the burglary. *Robinson* was decided by our supreme court two years after the *Drysdale* decision, which had held that even if the defense attorney's representation of the State's witness had terminated by the time of defendant's trial, a *per se* conflict of interest existed.

The State's witness in *Drysdale* had been the subject of an involuntary commitment proceeding resulting in an adjudication that the witness was in need of mental treatment. The court noted that the general subject matter of this previous employment was a proper subject for cross-examination and impeachment, while at the same time defense counsel was subject to a continuing duty not to disclose any confidence given to him by his former client. While pursuit of the details which led to an involuntary commitment for mental treatment might impugn the *competency* of a witness, *i.e.*, his inherent capacity to observe, recollect and communicate truthfully, impeachment for the purpose of attacking the *credibility* of the witness in the instant case was accomplished by the disclosure and cross-examination by defense counsel of the witness with regard to his previous conviction for forgery.

■ We therefore hold that due to the lack of any "*existing* personal relationship" between the defendant's attorney in the case at bar and the State's witness and the complete absence of any showing that defense counsel was in any way hampered in his cross-examination of the witness, defendant was not denied effective assistance of counsel.

While the concluding issues presented for review were not the subject of oral argument, we will address ourselves to each, in the order they appear in defendant's brief and argument.

The defendant contends that the state's attorney improperly elicited and then improperly commented upon in closing argument that Nichols had, at one time, been represented by the public defender.

The People contend that the defendant has waived any error in the redirect examination of Nichols, or by commenting thereon in closing argument, by failing to object during the course of the trial and by failing to preserve the issue for review in his post-trial motion.

This court has consistently held that alleged errors must be brought to the trial court's attention so that the trial court can correct them. If the defendant fails to do so, the errors are deemed waived. *People v. Guynn* (1975), 33 Ill. App. 3d 736, 338 N.E.2d 239; *People v. Ruple* (1980), 82 Ill. App. 3d 781, 403 N.E.2d 129.

■■ Assuming, *arguendo*, that the defendant has not waived any error in the admission of evidence identifying the public defender as the attorney who represented Nichols at his earlier plea negotiations, any error in the admission of this testimony was harmless error. To accept defendant's argument as to what might or might not have gone through the collective mind of the jury with regard to the disclosure of defense counsel's prior representation of a State's witness in a distinct and unrelated case would require our indulgence in pure speculation. We agree with the defendant that the initial disclosure and subsequent comment were unnecessary and should not have occurred. We do not agree that as such reversible error occurred.

The defendant contends that the prosecutor's comments on other people's fears of the defendant and on the defendant's statements that Phelps was in bed at 2:15 a.m. and that Phelps had not committed the murder were not based on the evidence. The defendant further contends that the prosecutor's comments about the changing of charges, the lack of fingerprints, and the prosecutor's Vietnamese experiences were improperly based on the prosecutor's personal experience.

The defendant further contends the prosecutor's comments on the "uncontradicted" nature of the evidence were improper comments on the defendant's failure to testify.

The People contend that the defendant waived any error in the prosecutor's closing argument by failing to object to many of his remarks, or in the alternative, that said remarks constitute harmless error. This court has consistently held that a failure to object to a prosecutor's remarks during closing argument results in a waiver of the objection. *People v. Lee* (1980), 84 Ill. App. 3d 441, 405 N.E.2d 860; *People v. Harris* (1975), 33 Ill. App. 3d 600, 338 N.E.2d 129; *People v. Arnold* (1974), 17 Ill. App. 3d 1043, 309 N.E.2d 89.

■■■ It is proper for the prosecutor to draw reasonable inferences from the evidence during closing argument even if those inferences are un-

favorable to the defendant. (*People v. Powell* (1973), 53 Ill. 2d 465, 292 N.E.2d 409; *People v. Parks* (1978), 57 Ill. App. 3d 405, 373 N.E.2d 783.) The character and scope of a closing argument are left to the sound discretion of the trial court, and absent an abuse of that discretion, the trial court's finding as to the nonprejudicial effect of a remark is upheld. *People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.

The People further contend that comments on the "uncontradicted" nature of the evidence are proper. It is well established that a prosecutor may comment on the uncontradicted nature of the State's case even when the only person who could have contradicted the State's evidence was the defendant. *People v. Skorusa* (1973), 55 Ill. 2d 577, 304 N.E.2d 630; *People v. Fulton* (1979), 68 Ill. App. 3d 915, 386 N.E.2d 605.

The defendant contends that a sentence of natural life violates article I, section 11, of the Illinois Constitution of 1970. He argues that article I, section 11, of the Constitution requires a trial court to consider a defendant's rehabilitative potential before imposing a sentence of natural life and that section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)) does not include such a requirement. The defendant further argues that the natural life statute violates the equal protection and due process of law clauses of the State and Federal constitutions.

The People contend that the defendant waived any issue challenging the constitutionality of the natural life provision. It is a well settled rule of law that issues not raised at trial or in post-trial motions are deemed waived. This general rule of law applies to both constitutional and non-constitutional issues. *People v. Lykins* (1979), 77 Ill. 2d 35, 394 N.E.2d 1182; *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Long* (1968), 39 Ill. 2d 40, 233 N.E.2d 389.

The defendant was clearly aware that the natural life provision applied to him prior to sentencing. After the sentence was imposed, he could have filed a motion challenging the constitutionality of the statute in the trial court. He chose not to do so. Despite the People's contention that the defendant's failure to challenge the constitutionality of the statute thereby waived his right to raise it for the first time on appeal, we will address ourselves to the issue.

■■ The natural life provision (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)) has been held to be constitutional. (*People v. Merchel* (1980), 91 Ill. App. 3d 285, 414 N.E.2d 804.) In *Merchel* the defendant challenged the constitutionality of the natural life statute. The *Merchel* court held that the statute did not violate either article I, section 11, of the Illinois Constitution or the equal-protection and due-process-of-law clauses of the State and Federal constitutions. The *Merchel* court pointed out that the natural-life provision does not require the judge to focus

solely on the nature of the offense. Under the provisions, the judge is also able to consider a defendant's rehabilitative potential. *People v. Merchel.*

Under section 5—5—3.1(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.1(b)), the character and record of the individual offender is considered together with the circumstances of a particular offense. The *Merchel* court further points out that article I, section 11, does not require that every sentence imposed on a defendant serve to restore the defendant to useful citizenship. The court recognized that the sentencing scheme attempts to balance the goals of restoring offenders to citizenship with the requirement that penalties be determined based on the seriousness of the offense. See also *People v. Nobles* (1980), 83 Ill. App. 3d 711, 404 N.E.2d 330.

The defendant finally contends that the trial court abused its discretion in sentencing him to natural life. The entire record, which was before the sentencing judge, indicates that he did not abuse his discretion in sentencing the defendant to natural life.

■■ Sentencing in Illinois is largely a matter of judicial discretion. A proper sentence must be based upon the particular circumstances of each case. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Included among the factors to be considered when imposing a sentence are the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, age, prior conviction record, and the nature and circumstances of the offense for which the defendant is being sentenced. (*People v. Phillips* (1978), 58 Ill. App. 3d 109, 373 N.E.2d 1072; *People v. Matthews* (1979), 69 Ill. App. 3d 65, 387 N.E.2d 10; *People v. Seiber* (1979), 76 Ill. App. 3d 9, 394 N.E.2d 1044.) The trial judge, during the course of the trial and sentencing hearing, has an opportunity to hear and consider the evidence and to observe the defendant. The trial judge is thus in a far superior position to evaluate these factors than a court of review which is limited to the facts contained in a cold record. (*People v. Phillips.*) Therefore, the trial judge's decision in regard to sentencing is entitled to great deference and weight, and a rebuttal presumption exists that the sentence he imposes is a proper one. *People v. Perruquet.*

In the case at bar, ample evidence was introduced at trial and during the sentencing hearing to support the defendant's sentence of natural life. The evidence at trial established that the defendant killed Chirekos, execution style, when Chirekos recognized him during an armed robbery. The evidence also established that the defendant attempted to escape while he was incarcerated for the instant offense.

The presentence investigation report indicated that the defendant was violent. The report further indicated that the defendant had several misdemeanor convictions and felony convictions for armed robbery and a crime against nature. The defendant spent six years in prison as a result

of his felony convictions. The presentence investigation report also indicated that the defendant spent time in the stockade for fighting while in the army and received an undesirable discharge from the military service.

The defendant introduced a psychological report at the sentencing hearing which also indicated that the defendant had violent tendencies and had an antisocial personality. During the sentencing hearing the defendant testified and admitted that he was more violent than most people. The defendant agreed with the jail administrator's characterization of him as "violent." The defendant also acknowledged that if he robbed a man and the man identified him, he might kill the man to avoid returning to prison. Thus, ample evidence exists to support a natural life sentence for the defendant.

The trial court, in imposing sentence in the case at bar, clearly indicated that he felt the defendant deserved a natural life sentence. The judge stated that he agreed with the prosecutor that this was an execution-type murder. The judge stated that he had interviewed approximately 250 people convicted of murder over the years and felt that this was the second worse case he had ever been involved in. The judge further stated that he was imposing the natural life sentence with the intention that the defendant serve every day of the remainder of his life in prison. Since the record supports the imposition of the natural life sentence, this court will not interfere with the trial court's imposition of sentence.

For the foregoing reasons, the defendant's conviction and sentence are affirmed.

Affirmed.

BARRY and HEIPLE, JJ., concur.