THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LARRY STROHL, Defendant-Appellant.

Fourth District No. 4—83—0232

Opinion filed November 3, 1983.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

Nancy Owen, State's Attorney, of Charleston (Robert J. Biderman and Rebecca L. White, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE WEBBER delivered the opinion of the court:

Defendant was charged by a four-count information filed in the

circuit court of Coles County with the shooting death of William Prather in violation of section 9—1(a)(1) and (2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (2)). He was tried to a jury which returned a general verdict of guilty and was sentenced to 28 years' imprisonment. During pretrial proceedings and at trial defendant was represented by the Public Defender of Coles County, Lonnie Lutz, who also filed on his behalf a post-trial motion. New counsel then entered the case and filed an amended post-trial motion which was denied. This appeal followed.

Defendant raises three issues for our consideration: (1) reasonable doubt in that the State failed to disprove his affirmative defense of self-defense; (2) failure of the court to give a voluntary manslaughter instruction in the absence of an express personal waiver of the instruction by defendant; and (3) conflict of interest on the part of defendant's counsel. We find no merit in any of the issues and affirm.

The State's principal witness was Collin Anthony Runner. He testified that he arrived at defendant's trailer home about 9:15 p.m. on June 4, 1982, and remained with defendant into the early morning hours of June 5 when the homicide apparently took place. When Runner arrived, Fred Carlen was already there and later Jim Dare and William Prather, the victim, arrived. Prather made several threats against defendant in the presence of the others in the apparent belief that defendant was responsible for Prather's having received an extensive prison sentence on a prior offense. Runner stated that Prather kept saying that he was going to "cut you [defendant] up— I'm going to kill you." He observed no weapon on or about Prather; defendant did not return any of the threats but appeared nervous.

Runner decided to leave the trailer and the others followed him. While outside and walking toward his car, he heard two shots. He turned and saw Prather "stiffen up" and next saw defendant shoot Prather again. He ducked behind a car and when he came out, defendant and Carlen were standing over the body of Prather. The body was then placed in the trunk of Carlen's car and the three, Carlen, Runner and defendant, drove out into the country and dumped it into a ditch where it was discovered by a farmer on June 6, 1982.

Runner further testified that he told his wife that there had been a shooting and that Prather had been killed. He stated that the only thing he saw in Prather's hand at the time of the shooting was a beer can but admitted that he was looking at Prather's face. He admitted to 1981 and 1982 convictions for possession of a controlled substance and was on probation with a revocation hearing pending at the time

of the incident at bar.

Runner reported the shooting to the police on June 6. He claimed that at that time an agreement had been reached as to the disposition of the revocation proceeding but that he had not yet gone to court about it.

Carlen testified and corroborated Runner's statement as to the threats made inside the trailer. He stated that after leaving the trailer he heard a couple of "popping sounds"; he turned and heard another sound; and then Prather stumbled and fell behind Carlen's car. He stated that he saw nothing in Prather's hand, but did see a gun in defendant's hand. The body was then placed in his car's trunk and disposed of as described by Runner.

Dare testified as to the threats, corroborating the others. He stated that when he left the trailer, he heard "three or four bangs"; he saw Prather stagger and fall; and he then drove away. The next day he saw the defendant at a friend's house where the defendant told him he "hated to be the one to have to do that."

Defendant's uncle testified that a .22-caliber pistol in evidence was the one which he had traded to defendant for a shotgun on June 4, 1982, and that on June 5 defendant had returned the pistol. He turned it over to the police.

The autopsy surgeon testified as to his findings. He stated that the cause of death was massive destruction of the brain due to a gunshot wound to the head. He further stated that there were "wounds in the left side of the head, in the right side of the trunk, near the center, and two wounds in the right arm." On further inquiry, he stated that it was an entrance wound and that such a wound suggested that the bullet "hit the head perpendicularly—that the muzzle was held somewhat perpendicularly to the head. *** This was a round regular wound, with a fairly uniform abrasion collar, and this all tends to indicate a perpendicular relationship of the muzzle or the bullet to the skin as it struck the skin." The doctor was of the opinion that the bullet was fired from a distance of at least 2½ to three feet away from the head. He also stated that the wound to the trunk came from the front, at the same approximate distance, and at an angle.

Numerous witnesses testified as to defendant's reputation as being nonviolent and Prather's reputation as being violent.

Defendant testified on his own behalf. He stated that he knew Prather had been released from prison and was looking for him. He testified as to the threats and said he became nervous that Prather would carry them out immediately. On cross-examination he admitted that he saw no weapon flashed by Prather while in the trailer. Ac-

cording to defendant's version of events, all parties left the trailer and Prather stood outside calling defendant to come out. He then went to his bedroom and obtained the gun and went outside. Prather blocked his way and threw a can of beer at him. He stated that Prather then pulled out what defendant believed to be a knife and made a pass at him with it; that he, defendant, moved backwards and tripped over the sidewalk; Prather kept moving toward him; he tried to get up and Prather made another pass with the knife. Defendant then pulled out the gun and fired; Prather kept advancing and defendant, in trying to get away, slipped, turned, and fired again. He maintained that the first shots were fired as he sat on the ground looking up at Prather, who was bent over him.

Defendant also testified that on the next morning he found a straight razor lying in his driveway. He believed it was Prather's. He then threw it into a lake, which was dragged by the police, but it was never recovered. On cross-examination he admitted that when he was first arrested, he told the police he had no knowledge of Prather's death.

At the instruction conference defense counsel tendered an instruction on involuntary manslaughter, which was refused by the trial court. The court then inquired of defense counsel if he intended to tender a voluntary manslaughter instruction. Counsel stated specifically that he did not on the express wishes of the defendant.

As to the first issue: defendant admitted that he shot Prather but claimed self-defense. The jury was thoroughly instructed on self-defense and justifiable use of force but elected to decide against it.

■ Defendant claims that the State did not disprove beyond a reasonable doubt his defense. We disagree. The only indication in the record of self-defense is the testimony of the defendant himself, but it is contradicted by other facts and circumstances in the record. The threats were undisputed but threats alone do not justify the use of deadly force. None of the other witnesses heard Prather calling to the defendant, none saw a scuffle, and none saw any weapon in Prather's hand. Most significantly, the autopsy findings belie defendant's version of events. The fatal wound to the head was fired at a distance of $2\frac{1}{2}$ to three feet perpendicularly. This is considerably at odds with defendant's story that he fired as Prather was bending over him.

■ It was the jury's province to accept or reject defendant's testimony. It is not the province of a reviewing court to set aside a verdict unless no rational trier of fact could have arrived at the same conclusion. We do not find that situation here. There was ample evidence to sustain the jury's verdict.

The instruction issue arises out of contradictory affidavits filed with the post-trial motions. As has been indicated at the instruction conference the trial judge inquired of defense counsel, "I understand you are not offering any instruction on voluntary manslaughter pursuant to your client's instructions?" Counsel replied, "That is correct, sir."

Defendant's second amended motion for new trial has attached to it two affidavits, one by defendant's trial counsel and the other by defendant himself. Each avers that defendant did authorize trial counsel not to offer a voluntary manslaughter instruction "on the understanding and considered probability that an Involuntary Manslaughter instruction would be given." Counsel's affidavit states that after the involuntary manslaughter instruction was refused by the trial court, he so advised the defendant. Defendant's affidavit, *contra*, states that following the refusal of the involuntary manslaughter instruction "my court-appointed counsel did not confirm my authorization not to offer a Voluntary Manslaughter instruction in the light of the refusal of the Involuntary Manslaughter instruction." Both affidavits state that the trial court, following the instruction conference, did not confirm in open court or otherwise defendant's authorization and intention not to offer the voluntary manslaughter instruction. Defendant's affidavit further avers that he "did not want to have the case to go to the jury only on a Murder instruction."

Defendant's argument is that he had a right to be present at the instruction conference, and as derivative of that right, the trial court had a duty to obtain a specific waiver from him personally of a voluntary manslaughter instruction. We know of no such right or duty and know of no well-reasoned authority to support them.

It is apparent from the affidavits that defendant and his trial counsel must have discussed trial strategy beforehand; otherwise, "confirming" a prior authorization becomes meaningless; and that strategy appears to be a complete reliance upon self-defense as a bar to a conviction and the basis of an acquittal.

Proper self-defense instructions were given; an instruction on involuntary manslaughter is legally inconsistent with self-defense, and in oral argument before this court it was admitted that the refusal of that instruction was proper; a voluntary manslaughter instruction would have been proper under the facts of this case, but it also would have subverted the trial strategy which was to obtain an acquittal on self-defense alone. Defendant's argument amounts to nothing more than an attempt to scale down the murder conviction when the self-defense theory failed.

In a murder versus self-defense case it is error for a court to refuse a voluntary manslaughter instruction when tendered. (*People v. Joyner* (1972), 50 Ill. 2d 302, 278 N.E.2d 756.) However, when such an instruction is not tendered, it is error for the court to give the instruction *sua sponte*, unless the evidence is closely balanced between murder and voluntary manslaughter. (*People v. Spataro* (1978), 67 Ill. App. 3d 69, 384 N.E.2d 553.) The balance was not close in the instant case, and had the court given the instruction *sua sponte*, it would have been intermeddling in trial strategy.

Defendant's final issue is a claim of *per se* conflict of interest on the part of his trial counsel. This was raised for the first time in the second amended post-trial motion filed by new counsel employed for that purpose.

The background of the matter is this: as has been indicated, defendant was represented at trial by the public defender, Lonnie Lutz. Late in the trial and after Collin Runner had testified for the State, Lutz attempted to introduce into evidence a letter which he had written to Runner on June 16, 1982, concerning a criminal charge on which Lutz was representing him. The stated purpose of the exhibit was to attack Runner's credibility. As we have indicated, Runner went to the police on June 6 and claimed that on that date he had made an agreement concerning the disposition of his case but had not yet gone to court. The letter, written 10 days later, indicates that a plea agreement had been offered by the State's Attorney which was for the first time, apparently, being passed on to Runner by Lutz. Lutz stated to the court that the letter would show that the possibility of a penitentiary sentence for Runner existed at the time he went to the police, no plea agreement then being in existence, and thus would reflect on his credibility.

The trial court sustained the State's objection to the exhibit on the ground that a proper foundation had not been laid for impeachment; *i.e.*, Runner had not been asked about the letter while he was on the stand earlier.

The trial commenced on August 24, 1982, and there is no showing in the record as to the disposition of Runner's case. Defendant argues that Lutz' representation of Runner effectively prevented him from vigorously and resolutely cross-examining him, and presented a *per se* conflict of interest which entitled him to a new trial. His argument is founded on *People v. Drysdale* (1977), 51 Ill. App. 3d 667, 366 N.E.2d 394, where the court held that a *per se* conflict is found where defense counsel's past or present commitment to others raises the possibility of an unwillingness or inability to represent the defendant on

trial effectively.

▮ In our opinion the better, and more workable, rule is found in *People v. Kloiber* (1981), 95 Ill. App. 3d 1061, 420 N.E.2d 870, holding that a *per se* conflict exists only when counsel represents the defendant and a State's witness at the same time. The *Kloiber* court acknowledged *Drysdale* but relied chiefly on *United States v. Jeffers* (7th Cir. 1975), 520 F.2d 1256, and *People v. Robinson* (1979), 79 Ill. 2d 147, 402 N.E.2d 157. *Jeffers* found no conflict in the absence of an existing personal relationship. *Robinson* distinguished cases involving active attorney-client relationships and those which did not have such an active association, holding that the former represented a *per se* conflict, while the latter did not.

▮ In the instant case there is no showing that Lutz was representing Runner on August 24, 1982. In fact, the fair inference from the letter is to the contrary, that Runner's case was closed. The letter indicates the plea agreement to be new probation concurrent with existing probation, payment of costs, and work release for a period of six months. No *habeas corpus ad testificandum* appears in the record and it would therefore seem that Runner was not incarcerated and that he had accepted the plea agreement. It follows that no *per se* conflict has been demonstrated.

▮ Where the facts do not establish a *per se* conflict of interest, it is defendant's burden to show an actual conflict of interest and to demonstrate prejudice in order to obtain a new trial. (*People v. Davis* (1983), 97 Ill. 2d 1, 452 N.E.2d 525.) In the case at bar, Lutz apparently did not believe an actual conflict of interest existed. He attempted to introduce his letter to Runner into evidence. It was only refused because he had not laid a proper foundation for the impeachment when he cross-examined Runner. Defendant hired private counsel, after the trial, who alleged a *per se* conflict of interest. Aside from the failure to introduce the letter into evidence, defendant can point to no actual conflict or prejudice. It appears that this failure was due to mistake by counsel, however, and not due to any alleged conflict. The competency and effectiveness of defense counsel at trial is not challenged. Defendant has failed to demonstrate that the cross-examination of Runner was significantly hampered. Indeed, Runner's motives and credibility were attacked on cross-examination, by other direct testimony, and in closing arguments by Lutz. Defendant has failed to carry his burden of showing actual conflict of interest and actual prejudice here.

▮ Other authorities have dealt with the conflict problem in other contexts, none of which we find applicable here. In *People v.*

*Kester* (1977), 66 Ill. 2d 162, 361 N.E.2d 569, the supreme court spoke of concurrent representation of conflicting interests, but held a *per se* conflict existed where the cases were related factually. There is no indication that any nexus of fact exists between Runner's case and that of the defendant. Also, in *People v. Vriner* (1978), 74 Ill. 2d 329, 341, 385 N.E.2d 671, 675, the supreme court spoke of the *per se* rule in situations "in which conflicts of interest are found to be inherent in the nature of the representation." It does not appear to us that there is any inherent conflict in representing a defendant when counsel has represented a prosecution witness in an unrelated case. If this rule were to be read too broadly, it would virtually eliminate the effectiveness of the office of public defender in smaller communities.

The judgment of the circuit court of Coles County is affirmed.

Affirmed.

TRAPP and GREEN, JJ., concur.