THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
TOMMY G. FLOYD, Defendant-Appellant.

Fifth District   No. 81—314

Opinion filed August 9, 1983.

Randy E. Blue and Susan A. Diehl, both of the State Appellate Defender's Office, of Mt. Vernon, for appellant.

Thomas H. Sutton, State's Attorney, of Carmi (Stephen E. Norris and Mary W. Richardson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE KARNS delivered the opinion of the court:

Defendant, Tommy Gordon Floyd, was charged by information with the murder of his wife, Avinelle Floyd. Following a jury trial in the circuit court of White County, defendant was convicted of murder and sentenced to 30 years' imprisonment. On appeal, defendant contends that the trial court erred in admitting certain hearsay statements made by the victim shortly before her death and in instructing the jury that defendant had confessed to murder.

The first witness to testify at trial was Chief Deputy Sheriff Mark Hall. Hall testified that on March 31, 1980, he received a report from Ray Yates and Chelsea Staley regarding an abandoned car parked near the Grindstone Creek Bridge. Yates and Staley believed that the car belonged to Avinelle Floyd whom they were aware did not report to work that day. After ascertaining that she was not at home, Hall, Yates and Staley went to the bridge where the car was parked. Hall checked the license on the car and determined that it was registered to Floyd's Auto Repair in Herald, Illinois. The three men then proceeded to climb under the bridge where they found Mrs. Floyd's body face down in water with her jeans down between the ankles and knees and the jean jacket and sweater blouse above her waist.

Tom Martin, a crime scene technician in the Illinois Department of Law Enforcement testified that on March 31, 1980, he responded to a call from the sheriff's department in Carmi. Martin prepared a diagram from photographs taken at the scene and testified that the bridge was a 20 foot by 15 foot concrete slab bridge without railings or barriers. He stated that the distance from the top of the slab to the bottom of the creek bed at the middle of the bridge was seven feet, six inches. Martin further testified that a forensic scientist examined scrapings from the fingernails of the decedent and found sand and gravel under the nails.

Paul L. Trefftzs, a funeral director and White County coroner, stated that he was called to the scene and informed that there was a body under the bridge. Civil defense technicians removed the body and placed it in a body bag and brought it to the funeral home where an autopsy was performed the next day. Trefftzs embalmed the deceased and testified that a picture of the victim showed bruises on the forehead, around the neck and right arm, a laceration on the left ear, parched lips and a broken nose.

Charles E. Hatfield, the father of the decedent's first husband and paternal grandfather of the three children of that marriage recounted that decedent expressed concern for her safety. He testified that decedent told him that she had given her children his phone number and said that if anything happened to her would he come and get the children at once. When Hatfield asked her why she was making this request, she said that she could not tell him over the telephone. Hatfield stated that this conversation occurred approximately a week before her death. Angela Hatfield, decedent's daughter, corroborated her grandfather's testimony.

The State introduced the testimony of several other witnesses who testified that decedent had expressed concern for her safety. Gary Finch, the attorney who represented Mrs. Floyd in her divorce proceeding against defendant, which never became final, testified over defendant's objection that decedent indicated that there was a possibility of physical violence. He testified that he told her to inform the sheriff so that he would be prepared in the event she needed to call him. Linda Murphy, a neighbor and friend of Mrs. Floyd, stated that after filing for divorce decedent had stated that she was worried about her physical safety. Sheriff Duckworth and Don Merritt also testified regarding decedent's concern.

Don Merritt, a family friend, testified regarding his visit to the Floyd residence on March 30, 1980. Merritt stated that defendant had broken a fan belt on his wife's car and told him that he was trying, "*** to stall Nell off from going to town *** until after 6 o'clock." Merritt further testified that defendant told him that he was going to take his wife to Shawneetown to get her drunk.

Vivian Hickerson, a neighbor of Mrs. Floyd and Barbara Jean Ray, a former waitress at the Levee Tavern in Shawneetown, both testified that defendant and his wife were in the tavern on the evening of March 30, 1980. That evening Mrs. Floyd informed Hickerson that she and her husband were getting a divorce. Hickerson testified that Mrs. Floyd confided in her that her husband was attempting to get her drunk "to get a little," but that he was not going to be successful.

On the evening of March 31, 1980, Mr. and Mrs. Don Merritt, Mr. and Mrs. Richard Smith and Linda Mundy gathered at the Floyd residence after learning that Avinelle Floyd had not returned home from the previous night and did not report to work that day. They testified, over defendant's objection, that defendant told them that he and his wife had argued on their way home from Shawneetown and that she ordered him out of the car and that he then walked and hitchhiked home. After an unsuccessful search for Mrs. Floyd, they returned to the Floyd home where they were informed by the sheriff and the coroner of her death.

Illinois Department of Law Enforcement Agent Steve Huggins testified that he interviewed defendant on several occasions. On the morning of April 1, 1980, and later that afternoon, defendant gave substantially the same account of events to Huggins as he had to family friends the previous evening. On April 10, 1980, Huggins interviewed defendant in the presence of Don Merritt. In his statement which was reduced to writing and later introduced into evidence, defendant stated that he drove with his wife in her car from Shawneetown to Carmi. During the trip to Carmi, defendant made sexual advances which his wife refused. She asked him to stop the car because she had to urinate and he then drove to the Grindstone Creek Bridge. Mrs. Floyd urinated behind the car and as she was standing up, defendant approached her and attempted to embrace her. Defendant then stated, "I don't know if I hit her, but I grabbed her and we fell into the creek." Defendant stated that he then left the creek and walked home.

At approximately 2 p.m. the same day, defendant repeated his statements to Sheriff Duckworth adding that he may have tried to draw his wife close to him before they fell into the creek and that he had seen bubbles around her head after they fell. Later that day, defendant told the sheriff that he had discarded his boots at his Indiana jobsite and had thrown his clothing into the Wabash River. The following day Huggins interviewed defendant "*** to see if any of the things in Tom Floyd's mind had cleared up following a night's rest." Huggins testified that defendant replied that, "I keep thinking I held her head under, but I didn't mean to hold it under too long. I was just trying to get her to come to me." Huggins further testified that defendant inquired about bond and when he was informed that bond may not be allowed, stated, "I did it. You guys know I did it. I need to get out and see the kids."

Dr. A. J. Venables, a pathologist, testified that Mrs. Floyd died as a result of asphyxia from drowning. On cross-examination, Dr. Venables stated that he did not believe that the bruises on the decedent's face

and head or her fractured nose were caused by blows from a fist. According to Dr. Venables, these injuries could have been caused by the body striking rocks in the water. He further testified that in his opinion these injuries would not have been sufficient to render her unconscious at the time she fell into the water.

Defendant testified in his own behalf as to the events of March 30, 1980. Defendant stated that he had worked on his wife's car that afternoon and after repairing it they took it out for a test drive. Although he drove to Shawneetown, defendant stated that this was not his intention when he left his home that afternoon. In addition, defendant denied telling Don Merritt that he was taking his wife to Shawneetown to get her drunk.

Defendant recounted visiting the Levee Tavern in Shawneetown and dancing with his wife during the evening. After leaving the tavern, they drove to Carmi so that she could pick up the school bus that she drove. When she stated that she had to go to the bathroom, defendant pulled the car over to the side of the road. Defendant stated that he began holding and kissing his wife outside the car and, after moving, they fell off the bridge. Defendant then stood up and saw his wife's motionless body floating on top of the water. Believing that she was dead, defendant panicked and walked home. Defendant testified that he did not strike his wife, nor did she strike him.

Defendant's first contention on appeal is that the trial court erred in admitting testimony concerning decedent's expressed fears for her physical safety. Defendant contends that such statements were inadmissible hearsay which was irrelevant because it was defendant's intent, and therefore his state of mind, which was the critical issue in the case, considering that all the evidence established that regardless of her possible fears, she voluntarily accompanied her husband for an evening of dancing and drinking at Old Shawneetown. The State, on the other hand, maintains that defendant waived this issue on appeal because he did not object to some of the statements, and the objections he did make were based on nonhearsay grounds. The State further maintains that, in any event, the testimony was properly admitted under the state-of-mind exception to the hearsay rule.

■ An objection to hearsay testimony must be made at the time of its introduction and should designate the particular testimony considered objectionable and the specific reason for the objection. Failure to make a timely and proper objection or to move to strike hearsay testimony after its admission constitutes a waiver. *People v. Patterson* (1981), 102 Ill. App. 3d 844, 430 N.E.2d 574.

In the present case, six witnesses testified regarding the dece-

dent's expressed fears for her safety. Defendant objected to the testimony of the first two of these witnesses, Charles Hatfield and Gary Finch, on the grounds that the testimony was irrelevant and remote in time and was overruled on both occasions. In his post-trial motion, defendant again objected to the admission of this testimony on the same grounds. We believe that defendant's timely objections have preserved for review the admissibility of Hatfield and Finch's testimony. Furthermore, we believe that defendant's objection on relevancy grounds identified the principal issue regarding the admission of decedent's extrajudicial statements.

▓ It is well settled that statements which indicate the declarant's state of mind are admissible as exceptions to the hearsay rule when the declarant is unavailable to testify and there is a reasonable probability that the proferred hearsay statements are truthful. (*People v. Lang* (1982), 106 Ill. App. 3d 808, 436 N.E.2d 260.) In order to be admissible, however, the declarant's state of mind must be relevant to a material issue in the case. It is the determination of whether the challenged statements are relevant which is the crux of the admissibility problem before us and the focus of our discussion.

The admissibility of extrajudicial statements under the state-of-mind exception has been addressed in numerous cases, but certainly one of the most thorough and extensive examinations of the subject can be found in *United States v. Brown* (D.C. Cir. 1974), 490 F.2d 758. In that case, defendant was convicted of murdering a man who was believed to be a link in defendant's drug distribution network. On appeal, defendant contended that the court erred in admitting the testimony of the victim's wife that her husband had told her that he was frightened that he would be murdered by defendant. The court agreed with the defendant and reversed his murder conviction, stating that there was no issue in the case which would justify an inquiry into the victim's state of mind.

Much of the court's lengthy discussion in *Brown* was devoted to the question of whether the victim's statements were relevant to some matter at issue in the case. In its analysis of this question, the court stated that the threshold requirement of admissibility of hearsay statements of fear of defendant is some substantial degree of relevance to a material issue in the case such as where defendant raises a claim of self-defense, suicide or accidental death. (490 F.2d 758, 767.) The court noted that a second requirement is that the extrajudicial statements must be probative of the victim's state of mind. 490 F.2d 758, 774.

In the instant case, defendant asserts that the statements attributed to the decedent are irrelevant because defendant's state of mind

and not that of the decedent was at issue in the case. The State, by contrast, maintains that the challenged testimony is admissible because defendant put decedent's state of mind at issue by alleging that her death was accidental.

The court in *Brown* presents an example in which a victim's extra-judicial statements of fear would be appropriate where accidental death is alleged by defendant. The example given is a situation in which the victim picked up defendant's gun and was accidentally killed while toying with it. The court stated that in such cases decedent's statements of fear as to guns or of defendant (showing he would not go near defendant under any circumstances) are relevant in that they rebut this defense. 490 F.2d 758, 767.

This example presents a situation far removed from the one now before this court. In the instant case, defendant's claim that his wife's death was accidental depended on the jury's believing his version of the facts and thus placed his state of mind at issue. The State, however, sought to interject decedent's state of mind into the case by proferring her out of court statements during its case-in-chief. Unlike the example in *Brown*, the statements regarding decedent's fear of defendant served no purpose other than to allow the jury to infer that defendant was guilty of murder, when in fact all the evidence established that the deceased voluntarily accompanied defendant to the Levee Tavern in Shawneetown.

The question of whether the victim's state of mind is relevant in a murder prosecution has been considered previously in this State. In *People v. Goodman* (1979), 77 Ill. App. 3d 569, 396 N.E.2d 274, defendant who was charged with murdering her husband contended that she acted in self-defense. To rebut this claim, the State presented the testimony of four witnesses who stated that defendant, a police sergeant, had told them that he was afraid of his wife and as a result, hid his ammunition when he returned home from work. Although the court reversed the conviction on the basis of insufficient evidence, it stated that this testimony was admissible under the state-of-mind exception to the hearsay rule in that such statements were offered only to show that decedent had a habit of unloading his weapon and hiding his ammunition. The court further noted that the victim's statements were not admissible to establish that his wife shot him.

The extrajudicial statements of the victim also were admitted into evidence in *People v. Lang* (1982), 106 Ill. App. 3d 808, 436 N.E.2d 260, a case in which defendant was charged with and convicted of murdering his wife. In that case, defendant testified that he had a good marriage and he believed that decedent was also happily married.

Defendant further testified that decedent was accidentally shot while she struggled with defendant over a shotgun during a rare marital argument. To contradict defendant's testimony, the State offered the testimony of three witnesses who testified that within two weeks of her death, decedent indicated that she was unhappy in her marriage and that she intended to leave him. The appellate court upheld the admission of the rebuttal testimony as to decedent's state of mind, noting that it was relevant to rebut the defense testimony concerning the marital accord between defendant and decedent, to respond to defendant's version of how his wife was shot and to suggest a possible motive for the crime. 106 Ill. App. 3d 808, 815, 436 N.E.2d 260, 266.

■■ We believe the above cases are distinguishable from the one before us because the challenged testimony in those cases was not offered merely for the purpose of establishing that defendant killed the decedent. In both cases, decedent's state of mind was relevant to an issue other than the ultimate question of guilt. In the present case, the statement that the decedent was afraid of defendant, coupled with her death, was only offered to suggest that defendant murdered her, an inference obviously extremely prejudicial to defendant's defense. After reviewing the questionable relevance of decedent's statements and the considerable prejudice inherent in them, we believe the trial court committed reversible error by admitting the statements into evidence.

Although we could rest our decision on the evidentiary issue alone, we will address defendant's remaining contention, which we believe has merit. In his second argument, defendant contends that the trial court erred in giving Illinois Pattern Jury Instruction (IPI), Criminal, No. 3.07 (1968), which states as follows:

"You have before you evidence that the defendant confessed that he committed the crime charged in the indictment. It is for you to determine whether the defendant confessed, and, if so, what weight should be given to the confession. In determining the weight to be given to a confession, you should consider all of the circumstances under which it was made."

Defendant contends that the giving of IPI Criminal No. 3.07 was improper because, although he made certain incriminating admissions, none of these statements constituted a confession to murder.

Defendant made several statements which the State maintains supports the trial court's instruction to the jury. Among the incriminating evidence are certain statements made by defendant to Special Agent Steve Huggins regarding his recollection of the evening of March 30, 1980. Defendant acknowledged that he and his wife fell off the bridge while he was making sexual advances to her and that he left her laying

face down in the water. He further admitted that he discarded his clothes and boots that he had worn that evening. Defendant also made the damaging statement that "I keep thinking I held her head under, but I didn't mean to hold it under too long I was just trying to get her to come to me." When he was informed that bail might not be allowed, defendant told Huggins, "I did it. You guys know I did it. I need to get out and see about the kids."

In order to constitute a confession, defendant's statements must admit all the necessary elements of the crime charged. (*People v. Williams* (1976), 37 Ill. App. 3d 151, 345 N.E.2d 705.) The acknowledgement of facts merely tending to establish guilt is not a confession but an incriminating admission. *People v. Oliver* (1977), 50 Ill. App. 3d 665, 365 N.E.2d 618.

The thrust of defendant's argument is that he did not confess to murder because he did not admit the necessary criminal intent or *mens rea*. Instead, defendant maintains that his statements disclose that he did not have the requisite intent and that, at most, he confessed to involuntary manslaughter.

After reviewing the record, we believe that defendant's statements did not constitute a confession to murder. Although we realize that a confession to a criminal act need not be made in the words defining the offense, *People v. Cartwright* (1975), 33 Ill. App. 3d 180, 337 N.E.2d 237, it must satisfy all the elements of the crime. In the present case, defendant made certain incriminating statements regarding the events which transpired on the evening in question. We do not believe, however, that defendant's statements are inconsistent with his contention that his wife's death was accidental. Although an involuntary manslaughter instruction was given, the court's informing the jury that it had heard evidence that defendant confessed to murder could only discourage them from properly evaluating the lesser charge. Consequently, we find that the trial court erred in giving IPI Criminal No. 3.07.

For the foregoing reasons, the judgment of the circuit court of White County is reversed and the cause is remanded to the circuit court of White County for a new trial.

Reversed and remanded.

KASSERMAN and JONES, JJ., concur.