(No. 59019.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. TOMMY G. FLOYD, Appellee.

*Opinion filed October 19, 1984.*

UNDERWOOD, J., dissenting.

Neil F. Hartigan, Attorney General, of Springfield, and Thomas H. Sutton, State's Attorney, of Carmi (Mark L. Rotert and James V. Cinotto, Assistant Attorneys General, of Springfield, Michael B. Weinstein, Assistant Attorney General, of Chicago, and Stephen E. Norris and Mary W. Richardson, of the State's Attorneys Appellate Service Commission, of Mt. Vernon, of counsel), for the People.

Randy E. Blue and E. Joyce Randolph, of the Office of the State Appellate Defender, of Mount Vernon, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

In a two-count information filed in the circuit court of White County, defendant, Tommy G. Floyd, was charged with the murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2)) of his wife, Avinelle Floyd. Following a jury trial defendant was convicted of murder and sentenced to 30 years' imprisonment. The appellate court reversed and

remanded for a new trial (117 Ill. App. 3d 168), and we allowed the People's petition for leave to appeal (87 Ill. 2d R. 315). The evidence is adequately reviewed in the opinion of the appellate court and will be repeated here only to the extent necessary to discuss the issues.

The testimony showed that on March 31, 1980, the office of the sheriff of White County received a report that an abandoned automobile was parked near the Grindstone Creek Bridge. The callers thought the deceased was the owner of the automobile and they also knew that she had not reported to work that day. The sheriff and two deputies went to the area and found Mrs. Floyd's body face down in the water. Her jeans were down between her ankles and knees, and the jean jacket and sweater blouse which she wore were above her waist.

Charles E. Hatfield, the deceased's former father-in-law, testified that the deceased "told me that she had give Angela and Carla and Darrell [her children] my telephone number and said if anything happened to her, would I come and get the children at once?"

Gary W. Finch, the deceased's attorney in the divorce action filed shortly before her death, testified she "indicated the possibility of physical violence" and that he advised her to contact the sheriff to prepare him in the event that she needed to call him about such violence.

Linda Mundy testified that a few days before filing the divorce action the deceased had expressed concern for her own safety. She stated that on March 31, when she and several others were present at the Floyd residence, defendant told them that on the previous evening "they had left Ridgway—or not Ridgway—Shawneetown and that they had a fight and she asked him to get out of the car or told him to get out of the car on that gravel road between Shawneetown and that implement dealer on the highway."

Richard Smith testified that on the morning of March 30 he visited the Floyd residence and spoke with both the deceased and defendant. He stated that the deceased was upset and defendant was angry. Defendant was building a closet for his clothes in the shop which was detached from the house. Defendant told him that he and his wife had not been sleeping together.

The deceased's daughter, Angela Hatfield, age 15, testified that her mother had told her she was concerned for her own safety and that she had called Angela's grandparents and "told them that if there was trouble or something that she wanted to know if we asked them if they would take care of us kids if anything happened." Angela also testified that her mother "made sure that their phone was—or their phone number was where we could call them if anything happened."

In a statement given to an agent for the Illinois Department of Law Enforcement, defendant stated that he traveled with his wife in her automobile from Shawneetown to Carmi, that during the trip he made sexual advances which she refused, that she asked him to stop the automobile so that she could urinate, and he then drove to the Grindstone Creek Bridge. After Mrs. Floyd urinated behind the automobile, defendant attempted to embrace her. He stated, "I don't know if I hit her, but I grabbed her and we fell into the creek."

Later that day defendant told the sheriff that he had discarded his boots and thrown his clothing into the river. The sheriff testified that defendant said, "I keep thinking I held her head under, but I didn't mean to hold it under too long. I was just trying to get her to come to me."

A pathologist testified that the deceased died as a result of asphyxia from drowning. He did not think that the bruises on her face and head, or her fractured nose, were caused by blows from a fist. He was of the opinion

that the injuries could have been caused by the body striking rocks in the water. In his opinion these injuries were not sufficient to have rendered her unconscious at the time she fell into the water.

In reversing the judgment the appellate court held that the circuit court erred in admitting the testimony concerning the deceased's fears for her own safety and in giving an instruction in the form of Illinois Pattern Jury Instruction (IPI), Criminal, No. 3.07 (1968).

The People contend that the circuit court correctly admitted the testimony concerning her expressed fears for her safety because her state of mind was relevant to a material issue in the case other than the ultimate question of defendant's guilt. They argue that defendant, by contending that her death was accidental, made his wife's state of mind an issue in the case and the testimony was properly admitted for the reason that it was probative of the question of the victim's state of mind.

We agree with the appellate court that "[i]t is well settled that statements which indicate the declarant's state of mind are admissible as exceptions to the hearsay rule when the declarant is unavailable to testify and there is a reasonable probability that the proffered hearsay statements are truthful." (117 Ill. App. 3d 168, 173.) We agree, too, that "[i]n order to be admissible, however, the declarant's state of mind must be relevant to a material issue in the case." 117 Ill. App. 3d 168, 173.

Following a careful analysis of *United States v. Brown* (D.C. Cir. 1973), 490 F.2d 758, and several appellate court opinions (see *People v. Goodman* (1979), 77 Ill. App. 3d 569; *People v. Lang* (1982), 106 Ill. App. 3d 808) the appellate court concluded that "the statements regarding decedent's fear of defendant served no purpose other than to allow the jury to infer that defendant was guilty of murder ***." 117 Ill. App. 3d 168, 174.

Evidence of the state of mind of the deceased may be

relevant when it serves to rebut the defense of accident. Cited by the appellate court is the example discussed in *Brown,* where the decedent's statements concerning fear of guns or of the defendant were held to be relevant in that they rebutted the defense that the victim had picked up the defendant's gun and was accidentally killed while toying with it. (See *United States v. Brown* (D.C. Cir. 1973), 490 F.2d 758, 767; *People v. Floyd* (1983), 117 Ill. App. 3d 168, 174.) The rationale of holding the evidence relevant was that "the deceased's statements of fear as to guns or of defendant himself (showing he would never go near defendant under any circumstances) are relevant in that they tend to rebut this defense." *(United States v. Brown* (D.C. Cir. 1973), 490 F.2d 758, 767.)* In contrast, the evidence here showed that the deceased voluntarily accompanied defendant on the evening of her death and that they had spent the evening drinking and dancing. Furthermore, defendant admitted that his wife had filed suit for divorce and that she had struggled to resist his sexual advances. Under the circumstances, evidence of the statements concerning her fear of harm served no purpose other than to create the inference that defendant was guilty of murder. We agree with the appellate court that admitting the testimony was reversible error.

The instruction which the appellate court held was erroneously given (IPI Criminal No. 3.07 (1968)) was revised prior to the publication of the second edition of IPI Criminal (1981). Although the error is therefore not likely to recur, we consider the People's contention that the appellate court erred in holding that the jury should not have been instructed:

"You have before you evidence that the defendant confessed that he committed the crime charged in the indictment. It is for you to determine whether the defendant confessed, and, if so, what weight should be given to the

confession. In determining the weight to be given to a confession, you should consider all of the circumstances under which it was made." (IPI Criminal No. 3.07 (1968).)

Defendant contends that the giving of this instruction was error because his statements, although incriminating, did not constitute a confession to murder.

It is the People's position that the first of the statements constituting a confession was given when defendant said that after he and the deceased fell off the bridge together, he got up, did not check whether she was alive, and walked home. In a second statement made later the same day defendant said that he could see bubbles coming up in the water from around the deceased's head. Defendant admitted that he had thrown away the clothes that he had worn on the evening of the deceased's death. The next day defendant admitted holding the deceased's head under water, but asserted that he did not mean to hold it under too long. Also, when informed of the possibility that bail would be denied, defendant stated: "I did it. You guys know I did it. I need to get out and see about the kids."

The People argue that defendant's assertion that he held the deceased's head under water, taken together with his other statements, constitute an admission that he killed an individual without lawful justification by performing the acts causing the death, knowing that such acts created a strong probability of death or great bodily harm to that individual. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2).) We disagree. A confession must acknowledge all the elements of a crime and be a confession of guilt. (*People v. Georgev* (1967), 38 Ill. 2d 165, 175; see also *People v. Horton* (1976), 65 Ill. 2d 413, 418.) We agree with the appellate court that although certain statements made by defendant are indeed incriminating, they are not inconsistent with his contention that the death of the deceased was accidental. We note that in the second edi-

tion of IPI Criminal the committee comment to the pattern instruction recommends that the legal conclusion whether a statement is an admission or confession not be communicated to the jury. IPI Criminal No. 3.06-3.07, Committee Note, at 20 (2d ed. 1981).

For the reasons stated, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE UNDERWOOD, dissenting:

I am not as certain as my colleagues appear to be that the evidence relating to the victim's state of mind was inadmissible. (See the in-depth discussion of this question in *United States v. Brown* (D.C. Cir. 1973), 490 F.2d 758.) But, even assuming the court is correct in saying that it is not admissible, that error, as well as any error in the complained-of instruction, was, in my judgment, harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Taylor* (1984), 101 Ill. 2d 508, 517.) Given defendant's admission that he and his wife were not sleeping together, that she had filed a divorce action, that she rebuffed his sexual advances that evening, that he held her head under water and watched the bubbles coming up, thereafter walked home without checking her condition, threw in the river the clothes he had worn that evening, and subsequently told the officers "I did it. You guys know I did it," I cannot believe a jury would have returned a different verdict had the complained-of instruction language and the state-of-mind evidence been excluded.

I would affirm the trial court's judgment.