THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RUTH HUBER, Defendant-Appellant.

First District (2nd Division)   No. 83—2352

Opinion filed February 11, 1985.

William G. Clark, Jr., & Associates, Ltd., of Chicago (Ilene Davidson Johnson, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (David C. Kluever and Donna J. Johnson, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:

After a bench trial, defendant Ruth Huber was found guilty of murder and sentenced to a prison term of 20 years. On appeal, she contends first that she was not proved guilty beyond a reasonable doubt; in the alternative, that she was proved guilty of no more than involuntary manslaughter; and, finally, that the trial judge committed reversible error in admitting certain hearsay evidence.

At trial, the State's case was comprised of circumstantial evidence, based upon the testimony of two principal witnesses, that after a quarrel the defendant stabbed and killed the 66-year-old decedent, who once lived with her as a lesbian lover and had known her for many years.

Initially, police testimony established that on the evening of October 21, 1982, a long-distance telephone call from a woman in California requested an investigation of the apartment in Chicago jointly occupied by the decedent and her mentally retarded 68-year-old brother.

After the brother admitted two police officers, he pointed to the living room sofa, where they found the decedent's body. When the brother said that his sister had collapsed as they had watched television, and the police saw no blood, weapons, or other signs of a homicide, they told the caller from California that the decedent had died from natural causes.

However, an autopsy eventually disclosed two stab wounds in the decedent's chest and lower back as the cause of death, and the police began a homicide investigation. The defendant allegedly told them that at 5 p.m. on the date of the decedent's death, the decedent telephoned her at her apartment and invited her to dinner. The defendant said she agreed to come over after dinner. Shortly after she arrived, the decedent collapsed. She and the decedent's brother then carried the decedent to the couch. At this point, the friend from California telephoned, and the defendant told her what had happened. The defendant then returned to her own apartment to walk her dogs, and when she returned, the police already had arrived. The police also questioned the decedent's brother, who was "pretty upset," and allegedly said again that his sister had collapsed while watching television. The police, however, recovered a pair of bloodstained pants belonging to the decedent's brother and a large knife from the kitchen sink. They also took photographs showing bloodstains on the living room carpet.

The State's first key witness, the decedent's brother, said that he had been employed steadily for about 20 years. He said that the defendant came to the apartment after dinner on October 21, 1982, and, while he was in the kitchen, he heard his sister tell her "to get out." When he returned, he saw his sister lying face-up on the floor. He also said that the defendant first told him that she "was sleeping," and he helped put her on the couch; however, before she left she told him that his sister "was dead." He further stated that she told him to wipe up the bloodstains on the carpet, and that the defendant moved the knife, which belonged neither to him nor to his sister, from the dining room table to the sink before the police arrived. He also said that he did not telephone or talk to the friend in California that night, and admitted that he did not tell the police any of this information the first two times he talked to them, though he did tell them this story when interviewed without the defendant present.

The State's second main witness was the 63-year-old woman who had called the police from California on the night of the decedent's death. She testified that she had known the defendant, the decedent and the latter's brother for over 40 years. She said that she had lived with the decedent as a lesbian lover, and that the decedent had left her

to move into the defendant's home in 1956. She said that she then remained friends with the decedent, who lived with the defendant until 1982, when the decedent moved into her brother's apartment to help take care of him after their mother died. She also said that the decedent's brother was not "capable of getting mad" and that he "loves everyone" and never tried to hurt his sister. She stated that at 5 p.m. (Chicago time) on October 21, 1982, the decedent telephoned her to discuss vacation plans. Then, at 7 p.m., the decedent's brother called, and she told him to get help from the neighbors. Five minutes later the defendant called, telling her that the decedent was lying on the floor. The witness told her to call her sister and then the police, but the witness then called the police herself. She also testified that both the decedent and the defendant were heavy drinkers; that they remained friends after the decedent moved out of the defendant's house; that the decedent's brother "was slightly retarded"; that the decedent, who did not like caring for her brother, at times "chastised" him or swore at him; and that she believed that the decedent loved the defendant. This witness also testified that over 10 years ago she had seen the defendant, who was physically larger than the decedent, ripping off the decedent's clothes and hitting her. She further stated that the decedent "wanted to get away from" the defendant because she "was abusive," and that the defendant was still in love with the decedent when she had moved out.

Over objection from defense counsel, the witness also testified that in telephone conversations, including one on the day of her death, the decedent had told her that the defendant had threatened her with violence, stating that the decedent said that on that day the defendant "had been quite violent" and had been willing to go to extreme lengths to get her to return, and told her "to move back with her." Defense counsel objected to this line of testimony as inadmissible hearsay; however, the trial judge stated that defense counsel had opened this line of questioning, and ruled that the hearsay testimony was relevant only as to "state of mind" at the time of the occurrence, and not to the truth of the matter asserted.

The primary witness for the defendant was her sister, who said that she had known the decedent and her brother for about 30 years. She testified that the decedent never showed any love for her brother and physically punished him and swore at him when he misbehaved. She also said that the decedent once threatened to kill her brother about seven years ago when he got lost, and that he feared her.

We must agree with the defendant's contention that the trial judge's ruling permitting the introduction of hearsay evidence of the

contents of the decedent's telephone conversations with her friend in California, especially on the day of her death, was reversible error. Initially, we do note that the trial judge explicitly stated, both during the testimony in question and in his summation before he entered his finding, that he did not admit the testimony for the purpose of proving the truth of the matter asserted, *i.e.*, whether the defendant had threatened the decedent with violence on the day of her death. Rather, the testimony was admitted only to show "state of mind" at the time of the occurrence. In this regard, we also note that there is some ambiguity, both in the briefs and in the record and on the parts of both counsel and the trial judge, as to precisely whose state of mind was at issue here—that of the decedent, or that of the witness (the caller from California).

In any event, we agree with the defendant that the trial judge erred in admitting this testimony. Although "statements which indicate the declarant's state of mind are admissible as exceptions to the hearsay rule when the declarant is unavailable to testify and there is a reasonable probability that the proffered hearsay statements are truthful" (*People v. Floyd* (1984), 103 Ill. 2d 541, 546, 470 N.E.2d 293), such statements "must be relevant to a material issue in the case" in order to be admissible (103 Ill. 2d 541, 546). In the instant case, the state of mind of the witness was clearly irrelevant, the relevant facts being simply that she called the police and that the defendant did not. Likewise, because the decedent's state of mind was not at issue here, the witness' testimony as to what the decedent told her about the defendant's actions—*i.e.*, threats of violence—also was irrelevant.

The defendant does not claim that the decedent in the instant case died as the result of accident or suicide, nor does she claim that she killed the decedent in self-defense. There is no question here that the decedent was murdered. Therefore, statements regarding the decedent's fear of the defendant served no purpose other than to permit the inference that the defendant was guilty of that murder. (*People v. Floyd* (1984), 103 Ill. 2d 541, 546; *People v. Coleman* (1983), 116 Ill. App. 3d 28, 33-34, 451 N.E.2d 973.) The statements were therefore improperly admitted.

We cannot conclude, as the State invites us to do, that this improper admission of hearsay evidence was harmless error. Undeniably, the testimony here was extremely damaging to the defendant; it suggested that the defendant had been "quite violent," and was ready to go to extreme lengths to have the decedent move in with her again, and that these circumstances existed even on the very day of the killing. This was the only testimony establishing with any specificity the

status of the relationship between the defendant and the decedent on that critical day, and it was also the only testimony indicating that the defendant threatened, felt violent toward, or was predisposed to act violently toward the decedent on the day of her death. Yet, the defendant had no opportunity to cross-examine the decedent on the circumstances or veracity of that damaging hearsay statement.

Despite the trial judge's statements that he did not consider this evidence for the purpose of determining the truth of the matter asserted and accepted it only for a restricted purpose, we are not convinced that prejudice did not result from his ruling. This is not a case where a judge weighed whether ordinarily admissible evidence should be rejected because of its prejudicial effect. Rather, the judge here admitted ordinarily inadmissible evidence for an incorrect reason. Thus, not only was the evidence admitted improperly, but it was admitted despite its clearly prejudicial side effect. Regardless of the trial judge's comments that he was admitting the evidence for a restricted purpose, in the interest of justice we cannot afford to indulge in the usual presumption that he was not paying any attention to this hearsay testimony, in the case of a murder trial where the State and the trial judge himself correctly agreed that the evidence against the defendant was circumstantial. This improperly admitted hearsay testimony, which was referred to by the State in its closing argument, might well have been the linchpin which ultimately locked in the judge's determination as to guilt or innocence. Under these circumstances, we cannot say that the error here was harmless beyond a reasonable doubt. See *People v. Fair* (1977), 45 Ill. App. 3d 301, 359 N.E.2d 848; *People v. Trotter* (1975), 27 Ill. App. 3d 136, 326 N.E.2d 524; *People v. Rice* (1972), 5 Ill. App. 3d 18, 282 N.E.2d 526.

Because of the erroneous admission of the hearsay testimony, this case must be reversed and remanded for a new trial. The need for a new trial makes it inappropriate for this court to express its opinion as to the issues raised on appeal regarding the defendant's guilt or innocence. We would merely comment that, under *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366, we do not believe that the properly admissible evidence was insufficient, if believed, to warrant a reversal or reduction of the offense based on that evidence.

Accordingly, the judgment of the circuit court is hereby reversed and the cause remanded for a new trial.

Reversed and remanded.

PERLIN and BILANDIC, JJ., concur.