THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JULIAN SOWINSKI, Defendant-Appellant.

First District (1st Division) No. 84—2751

Opinion filed September 22, 1986.

234

Epton, Mullin & Druth, Ltd., of Chicago (Barry B. Gross, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer and Susan Davis Brunner, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE QUINLAN delivered the opinion of the court:

The defendant, Julian Sowinski, was charged by information with the murder of Timothy George. Following a jury trial in the circuit court of Cook County, the defendant was convicted of murder and sentenced to 25 years' imprisonment. The defendant now appeals his conviction.

The issues raised by the defendant in this appeal are: (1) whether the jury was properly instructed on the law pertaining to the charge of murder when self-defense was an issue in the case; (2) whether the State failed to prove beyond a reasonable doubt that the defendant was unjustified in his use of force; (3) whether the defendant was denied effective assistance of counsel; (4) whether the trial court erred by not giving a voluntary-manslaughter instruction *sua sponte*; and (5) whether the trial court abused its discretion in determining the defendant's sentence.

We affirm the defendant's conviction.

On May 15, 1983, at approximately 7 a.m., Timothy George was

found dead on the lawn of his home in Alsip. A subsequent autopsy revealed that George died of a single gunshot wound to the stomach. A .25-caliber bullet was recovered during the autopsy, and also found in George's blood at that time were 174 milligrams of alcohol per 1000 milliliters of blood, which indicted that he was intoxicated at the time of his death.

At the defendant's trial, Thomas Hogan testified that he had met Timothy George for the first time at a party in Tinley Park on the evening of May 14, 1983. At approximately 1:30 a.m. on May 15, 1983, George asked Hogan for a ride home. Hogan stated that George appeared to be heavily intoxicated, and was having difficulty walking and talking. The two left the party at approximately 2 a.m. in Hogan's 1979 maroon Pontiac Firebird.

When they reached the intersection of 135th and Harlem, Hogan drove into the parking lot where Chrissy's Bar was located and stopped at George's request. Hogan stated that he and George got out of the car and walked up to the front door of the bar. Upon discovering that the door was locked, George began pounding on the door. Hogan heard a voice from inside the bar yelling, "we're closed." Hogan urged George to leave, but he refused and began kicking the door. Hogan then turned away from George and started to walk towards his car. On his way to the car Hogan heard George say, "Come on out here so I can kick your ass." He then heard the bar door open and the sound of people arguing. As Hogan reached his car, he heard several gunshots. Hogan turned around and saw a man holding a gun above his head. Hogan saw the man fire two more shots. George returned to Hogan's car and told Hogan that he had been shot. He showed Hogan his wound which, according to Hogan, was on the left side of his body.

Hogan testified that he then drove his car to the back of the building to get away from "the man with the gun." After George began to get sick, Hogan stopped and helped him get out of the car. George then vomited in the parking lot.

About five minutes later, Hogan helped George get back into the car, and asked him if he wanted to go to a hospital. George said no, and stated that he wanted to go home. When they arrived at George's house, Hogan pulled George out of the car, put him on the front lawn, and left. Hogan testified that he did not call the police or notify anyone because he was afraid. He did not talk to the police regarding the incident until September 1983, when the police contacted him concerning George's death.

At the trial, Hogan was unable to make an in-court identification

of the individual who fired the gun at George. He did testify that he never saw George with a weapon in his hand.

The record further reveals that at the time of the incident, the defendant and several other employees of Chrissy's Bar were inside the bar celebrating the birthday of Elaine Radz, a waitress at Chrissy's. The defendant was the manager of Chrissy's Bar and had closed the bar at its normal closing time of 3 a.m. that morning. The front door of the bar was locked during the celebration. Several of the employees who were present inside the bar during the incident also testified at the defendant's trial.

Paul Zajec, who was working as a bartender at Chrissy's on the morning of May 15, 1983, testified that the bar closed at 3 a.m., and that sometime thereafter someone began pounding on the door asking for beer. Zajec stated that the defendant went to the door and started arguing with the man outside. Zajec could hear the defendant yelling, but he could not hear what the defendant was saying. The arguing went on for approximately two minutes. Zajec then heard two shots fired. He looked out the window behind the bar and saw the defendant standing approximately 4 feet away from the door holding a gun in his right hand. Zajec saw the defendant extend his right arm at chest level and fire two or three more shots. He could see two men he did not know standing about 50 feet away from the defendant, directly in the defendant's line of fire. Zajec stated that the two men were shouting at the defendant, and did not appear to have any weapons in their hands.

Zajec further testified that the two men got into a "1977 or 1978 Firebird." Looking out a different window, he watched the two men drive around to the back of the building and saw them get out of the car. Zajec testified that he saw one man lying on the ground and the other man standing over him. By that time, the defendant had come back into the bar through the front door. Zajec told the defendant that he thought the defendant had shot the man. The defendant responded that the man was just "throwing up" because he was drunk.

Steven Guevera was also tending bar at Chrissy's during the early morning of May 15, 1983. He, too, testified that after the bar closed someone began kicking the front door asking for beer, and that the defendant went to the door and told the man that the bar was closed. The man repeated his request for beer and then said either, "do you want to get blown away" or "you're gonna get blown away." According to Guevera, the defendant opened the door and told the man to leave. Guevera then saw the defendant put his hand into his pocket, take something out of his pocket, and as he did so, turn his back away

from Guevera. Guevera stated that he heard two shots which he presumed were fired by the defendant. After the shots were fired, the defendant came back into the bar and handed Guevera a small chrome and silver gun. The defendant told Guevera to put the gun away. Guevera cleaned the gun by wiping the handle, and put the gun under the bar. He testified that he never saw the gun again. When asked on direct examination, Guevera stated that he never saw the man who was banging on the door with any weapon in his hands.

Carmen Nudo, who worked as a doorman at Chrissy's Bar, and Elaine Radz, who, as stated previously, was a waitress there, also testified at the trial. Much of their testimony was similar to that of Paul Zajec and Steven Guevera. They testified that they heard banging at the door and that the defendant went to the door and told the man that the bar was closed. After the man refused to leave, the defendant opened the door and went outside. Nudo testified that he heard people arguing, followed by the sound of gunshots. Nudo went to the door, stepped outside and saw two men he did not know standing near a car. One of the men told Nudo that "he was going to get his brothers and come back and fix them all." The two men then got into the car and drove off. After the defendant and Nudo returned to the bar, the defendant told Nudo that he "gave the guy a crack upstairs the head." When Nudo asked the defendant about the shots he had heard, the defendant replied, "never mind."

Ms. Radz testified that she was able to identify the man at the door as Timothy George, and that he was not carrying a weapon. She said that she did not know what transpired after the defendant unlocked the front door and went outside. Ms. Radz did testify that following the incident no one had called the police. She also stated that on the following Monday, May 16, 1983, the defendant told her not to mention the incident to anyone, because he had not yet told the owners of the bar.

The defendant, who testified on his own behalf, stated that shortly after he had closed the bar at 3 a.m. on May 15, 1983, someone began pounding and kicking the door asking for beer. The defendant told the man to leave because the bar was closed, but the kicking continued. The defendant then opened the door and heard the man say, "you want to get blown away?" and "what the hell's with you—you want me to blast you?" The defendant stated that the man turned to his left and reached into his back pocket. At that point, the defendant pulled out his gun and fired two warning shots into the air. The defendant stated that the man continued to reach into his pocket and pulled out an object that "flashed and made a loud noise." The

defendant then fired another warning shot into the air. He said the other man fired one shot straight ahead, and then put what the defendant thought was a gun into his back pocket. The defendant fired another shot, but stated that he never fired anywhere near the man, and that all of his shots were fired into the air. The defendant stated that the man did not appear to have been shot. He said that the man swore at him and told him that he would be back with his brothers to get him and everyone else in the bar. Shortly thereafter, everyone left the bar because they were afraid the man might return with his brothers.

The defendant testified that the gun he used that night was a .22-caliber automatic and belonged to the owners of Chrissy's Bar, George and Christina Thorp. He stated that he was carrying the gun in his pocket on the morning of the occurrence because he was getting ready to leave and usually took the gun home with him every night. The defendant said that he did not call the police because the person creating the disturbance had left, and everyone wanted to go home. He stated that he left the gun at the bar that evening, but when he returned to the bar the following Monday morning he could not find the gun. He said that he learned of the victim's death approximately one week later, but did not call the police. He was eventually contacted by the Alsip police department in September 1983 as part of its investigation into George's death.

Glynes McDonnell was called as a rebuttal witness. She testified that she lived with George, and that they left home together to go to a party on the night of May 14, 1983. She stated that George was dressed in a white T-shirt and gray tweed trousers when he left home that evening. These trousers did not have a right rear pocket, and the left rear pocket was stitched almost completely closed. McDonnell further stated that George was right handed.

After the close of all the evidence and during the instruction conference, the defendant advised the court that he had conferred with his attorney regarding alternative verdicts, and instructed his attorney not to tender any instructions other than guilty and not guilty of murder. Defense counsel also told the assistant State's Attorney that he only wanted instructions on murder and self-defense. The State then submitted certain definitional and issues instructions without any objection by defense counsel. The court accepted the instructions as tendered.

During closing arguments, defense counsel stated that the defendant did not believe he had shot Timothy George, but that if he did, it was in self-defense. Defense counsel told the jury that the State had

the burden of proving the defendant guilty beyond a reasonable doubt. In its rebuttal argument, the prosecution acknowledged its burden of proof for the murder charge, and advised the jury that the court would instruct them on the issue of self-defense.

Thereafter, the jury found the defendant guilty of murder. The trial judge entered judgment on the verdict and, subsequently, sentenced the defendant to 25 years' imprisonment. The judge stated that this sentence included one additional year over the 20 year minimum for each month of the five-month period that the victim's family did not know what had happened to Timothy George. After plaintiff's post-trial motions were denied, the defendant filed this appeal.

The defendant's first contention on appeal is that the jury was improperly instructed on the law pertaining to the charge of murder when self-defense was an issue in this case.

The Illinois Pattern Jury Instructions (IPI) provide that when an affirmative defense, such as self-defense, is raised, the elements of that defense should be treated in the jury instruction in two ways:

> "[F]irst, by definition following the definition of the crime with which the defendant is charged; second, in the same instruction with the issues or elements of the crime and the State's burden of proof. *** The appropriate issues and burden of proof defenses instruction should be superimposed upon the appropriate issues and burden of proof crimes instruction so that the jury receives a single instruction covering all of the issues in the case." Illinois Pattern Jury Instruction, Criminal, No. 24—25.00, Introduction at 548 (2d ed. 1981) (hereinafter cited as IPI Criminal 2d).

Also, Supreme Court Rule 451(a) (87 Ill. 2d R. 451(a)) provides that whenever IPI contains an instruction applicable in a criminal case, the IPI instruction shall be used, unless the court determines that it does not accurately state the law. The IPI provide that when a defendant charged with murder raises the issue of self-defense, IPI Criminal 2d No. 24—25.06A and IPI Criminal 2d No. 7.02 shall be combined. Thus, the IPI murder instruction when self-defense is raised states as follows:

> "To sustain the charge of murder, the State must prove the following propositions:
>
> *First*: That the defendant performed the acts which caused the death of _____; and
>
> *Second*: That when the defendant did so,
>
> [1] he intended to kill or do great bodily harm to _____;

or

[2] he knew that his acts would cause death or great bodily harm to _____;

or

[3] he knew that his acts created a strong probability of death or great bodily harm to _____; and

*Third*: That the defendant was not justified in using the force which he used.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." IPI Criminal 2d Nos. 7.02 and 24—25.06A.

The State's instruction No. 9 which, in this case was intended to cover the issue of murder when self-defense is raised, was tendered to the jury without objection by defense counsel. Instruction No. 9 provided:

"To sustain the charge of Murder, the State must prove the following propositions:

First: That the defendant performed the acts which caused the death of TIMOTHY GEORGE; and

Second: That when the defendant did so, he intended to kill or do great bodily harm to TIMOTHY GEORGE;

or

he knew that his acts would cause death or great bodily harm to TIMOTHY GEORGE;

or

he knew that his acts created a strong probability of death or great bodily harm to TIMOTHY GEORGE; and

that the defendant was not justified in using the force which he used.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all of the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

The defendant's primary argument here is that the trial court committed reversible error when it tendered the language of instruction No. 9 to the jury rather than the specific language of IPI Crimi-

nal 2d Nos. 7.02 and 24—25.06A. Under IPI Criminal 2d Nos. 7.02 and 24—25.06A, the words, "[f]irst," "[s]econd," and "[t]hird," are used to enumerate the propositions needed to be proved by the State in order to obtain a conviction. A comparison of IPI Criminal 2d Nos. 7.02 and 24—25.06A and instruction No. 9 reveals that the language of instruction No. 9 is identical to the language of IPI Criminal 2d Nos. 7.02 and 24—25.06A, except that in instruction No. 9 the phrase "that the defendant was not justified in using the force which he used," is not set forth as a separate and distinct third proposition, specifically enumerated by the term "third." Thus, the defendant appears to argue here that, while it is clear from the language in IPI Criminal 2d Nos. 7.02 and 24—25.06A that the State must prove lack of justification as to all three alternative mental states set forth under the second proposition, the omission of the word "third" from instruction No. 9 could have caused the jury here to believe that the State had the burden of proving lack of justification only if the jury concluded that the defendant "knew that his acts created a strong probability of death or great bodily harm," the last of the three alternative mental states. The defendant maintains, therefore, that the jury here was not instructed that the State had the burden of proving beyond a reasonable doubt that the defendant was not justified in using the force which he used if the jury concluded that the defendant killed Timothy George while he intended to kill or do great bodily harm to him, or knew that his acts would cause death or great bodily harm to Timothy George, the first and second alternative mental states set forth under the second proposition in instruction No. 9.

The defendant concedes on appeal, however, that he failed to object to instruction No. 9 either at trial or in his post-trial motion, and that he never submitted the specific language of IPI Criminal 2d Nos. 7.02 and 24—25.06A to the trial court. The defendant, nevertheless, claims that the erroneous instruction offered by the State rises to the level of plain error affecting his substantive rights. We will consider, therefore, whether the unpreserved error here constitutes plain error.

 The failure to object at trial to an error in jury instructions or failure to raise it in a post-trial motion waives the issue for purposes of appeal. (*People v. Thurman* (1984), 104 Ill. 2d 326, 329, 472 N.E.2d 414; *People v. Berry* (1984), 99 Ill. 2d 499, 503, 460 N.E.2d 742.) However, Illinois Supreme Court Rule 451(c) (87 Ill. 2d R. 451(c)) sets forth a limited exception to the waiver rule, which provides:

> "[S]ubstantial defects [in instructions in criminal cases] are not waived by the failure to make timely objections thereto if

the interests of justice require. (87 Ill. 2d R. 451(c).)" This exception to the waiver rule will only be invoked to (1) correct "grave errors," or (2) in cases so close factually that fundamental fairness requires that the jury be properly instructed. (*People v. Thurman* (1984), 104 Ill. 2d 326, 329-30, 472 N.E.2d 414.) In making its determination of whether to apply the plain-error exception to the waiver rule, the court must ask if the defendant was prejudiced to the extent that he was prevented from receiving a fair trial. (*People v. Pittman* (1984), 126 Ill. App. 3d 586, 591, 467 N.E.2d 918.) Furthermore, the instructions must be examined as a whole to determine whether their cumulative impact cures or lessens the prejudice caused by the alleged error. 126 Ill. App. 3d 586, 592, 467 N.E.2d 918.

■ We examine the issue of "grave error" first. As indicated above, the State's instruction No. 9 differed from IPI Criminal 2d Nos. 7.02 and 24—25.06A in that the phrase "[t]hat the defendant was not justified in using the force which he used," was not set forth as a separate and distinct third proposition. We find, however, that the apparently inadvertent omission here of the word "[t]hird" before the phrase "[t]hat the defendant was not justified in using the force which he used," does not constitute "grave error" as that term has been defined by the courts in Illinois. (See *People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861; *People v. Jenkins* (1977), 69 Ill. 2d 61, 370 N.E.2d 532; *People v. Sanders* (1984), 129 Ill. App. 3d 552, 472 N.E.2d 1156.) An examination of the language used in instruction No. 9 reveals that the three alternative mental states listed under the second proposition are joined by the disjunctive "or," which indicates that each mental state is to be taken separately, and that only one mental state needed to be proved by the State. Also, we believe, the word "and" after the third mental state indicated that the lack of justification portion of the instruction must be proved *in addition to* one of the three alternative mental states to obtain a conviction. While we, of course, concur that it would have been better not to have used this form of the instruction, the inadvertent omission here of the word "third" did not, under the circumstances, create an erroneous instruction.

■ Furthermore, as noted above, a challenged instruction should not be viewed in isolation, but must be viewed in light of the entire charge. (*People v. Matthews* (1984), 126 Ill. App. 3d 710, 714, 467 N.E.2d 996.) In examining the instructions as a whole, we find that the instructions tendered here sufficiently detailed the elements and definitions of murder and self-defense, including the defendant's justifiable use of force, and also set forth the State's burden of proof for

murder when self-defense was an issue. As in *People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248, the instructions tendered here were neither contradictory nor missing essential elements of the crime charged.

In support of his argument that the jury instructions tendered here were substantially defective, the defendant cites *People v. Thurman* (1984), 104 Ill. 2d 326, 472 N.E.2d 414. We find, however, that *Thurman* is inapposite. In *Thurman*, the legal justification language was entirely omitted from the issue instruction for involuntary manslaughter and murder. The supreme court found that omission to be reversible error because the jury there could have been misled. In the instant case, however, issues instructions were given for the crime of murder only, and these instructions did properly include the lawful justification language.

The defendant also cited *People v. Berry* (1984), 99 Ill. 2d 499, 460 N.E.2d 742. *Berry*, however, involved at trial where IPI Criminal No. 25.05 (1968), the precursor to IPI Criminal 2d No. 24—25.06A, was completely omitted. The jury there was not given the issue instruction which specified all of the elements that the State is required to prove beyond a reasonable doubt in order to establish that the defendant's use of force was not justified. Thus, the facts in *Berry* are clearly distinguishable. In the instant case, with the exception of the word "[t]hird," the jury was given IPI Criminal 2d Nos. 7.02 and 24—25.06A in their entirety, as well as IPI Criminal 2d No. 24—25.06, the instruction defining justifiable use of force.

We believe, therefore, that the instructions given here apprised the jury that the State had the burden of proving that the defendant was not justified in the force he used as to all three alternative mental states set forth under the second proposition in instruction No. 9. Consequently, the submission of instruction No. 9 to the jury in the form proposed by the State did not constitute "grave error."

■ With respect to the "factually close" prong of the plain-error test, our review of the record leads to the conclusion that the evidence was not factually close. The record establishes that there was little evidence, if any, presented at trial to support a self-defense instruction, as the defendant testified that he did not shoot at Timothy George, but in fact only fired three warning shots into the air. Thus, while the defendant in his testimony contended that he was in fear for his life, he inconceivably asserted that he only shot into the air, which diminishes the plausibility of his claim under these circumstances. Thus, we do not find this case to be factually close. Accordingly, we concluded that there was no plain error in the self-defense

legal justification instruction given to the jury.

■■ The defendant next asserts that the State failed to prove beyond a reasonable doubt that the defendant was unjustified in his use of force.

The Criminal Code provides that an individual "is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another." (Ill. Rev. Stat. 1983, ch. 38, par. 7—1.) The determination of whether a criminal act is justified under the law of self-defense depends on all of the surrounding facts and circumstances. (*In re C.P.* (1986), 141 Ill. App. 3d 1018, 1022, 491 N.E.2d 44.) A criminal conviction will not be reversed unless the evidence is so improbable that a reasonable doubt about the defendant's guilt is raised. *People v. Vriner* (1978), 74 Ill. 2d 329, 342, 385 N.E.2d 671.

The defendant, as stated previously, asserts that he was in fear for his life because he had been threatened twice by Timothy George, and saw an object come out of his rear pocket that "flashed and made a loud noise." The record reveals, however, that although some of the witnesses who testified heard George threaten the defendant, no one saw George with a weapon or any object that "flashed and made a loud noise." No weapon was ever found at the scene or on George's body. Glynes McDonnell, the victim's girl friend, testified that the trousers worn by George that evening did not have a right rear pocket, and the left rear pocket was stitched almost completely closed. Thus, according to her testimony, the victim could not have pulled a gun out of either of his rear pockets as the defendant maintains.

Moreover, the defendant testified that he never fired his gun anywhere near George, but that all shots were fired into the air. But, this portion of the defendant's testimony. was specifically contradicted by Paul Zajec, who testified that he saw the defendant fire two or three shots directly at George. Additionally, if in fact the defendant did fire his gun into the air as he asserted, it is highly unlikely that George would have been struck at all, or in the manner in which he was. The testimony was not, therefore, consistent with the defendant's claim of self-defense.

■■ Where, as here, the evidence is conflicting, a court of review will not substitute its judgment for that of the trier of fact. (*People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733.) Questions of reasonable use of force in self-defense are particularly within the province of the jury and should not be lightly disturbed. (*People v.*

*Clevenger* (1985), 130 Ill. App. 3d 1087, 1092, 475 N.E.2d 290.) As noted by this court in *People v. Perry* (1980), 91 Ill. App. 3d 988, 993, 415 N.E.2d 523:

> "[T]he trier of fact does not have to accept as true the testimony presented by [the] defendant concerning self-defense, but, rather, in weighing such evidence [it] must consider the probability or improbability of the testimony, the circumstances surrounding the killing, and other witnesses' testimony."

The jury here could have easily concluded that a drunken Timothy George threatened the defendant verbally from behind a locked door, and the defendant, never really fearing for his safety, unlocked the door, stepped outside and shot Timothy George without a reasonable belief that such action was necessary to prevent imminent death or great bodily harm to himself or another. Accordingly, we find no basis to set aside the verdict of the jury in this case.

██ █ The defendant submits as his next assignment of error that he was denied effective assistance of counsel. Specifically, the defendant argues that his trial counsel erred in (1) making improper objections at trial; (2) failing to object to numerous leading questions and hearsay answers; (3) failing to object to the State's asserted improper statements in closing argument; (4) failing to object to erroneous instructions; and (5) failing to obtain the proper issues instruction for murder.

The Illinois Supreme Court in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, adopted the standard set forth by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064-65, for adjudicating effective assistance of counsel claims. The *Strickland* court held that in order to establish ineffectiveness, a defendant must show (1) that counsel's performance was seriously deficient; and (2) that the deficient performance prejudiced the defense. A defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) A defendant must also overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and that the challenged action might have been nothing more than part of counsel's sound trial strategy. 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065-66.

 While the representation afforded the defendant in this case may have been less than perfect, we cannot say that counsel's performance as a whole deprived the defendant of a fair trial. Defense

counsel made opening and closing arguments of reasonable quality, entered numerous objections during trial, cross-examined all of the State's witnesses, made a motion for a directed verdict, and filed a post-trial motion on the defendant's behalf. We find that counsel's performance did not fall below an objective standard of reasonableness, and, in any event, the defendant's asserted errors here are clearly insufficient to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) The allegations of incompetency here are directed at questions of trial strategy, the exercise of professional judgment, and matters within trial counsel's discretion, which are all clearly inappropriate for review by this court. (*People v. Greer* (1980), 79 Ill. 2d 103, 122, 402 N.E.2d 203; *People v. Newell* (1979), 48 Ill. 2d 382, 387, 268 N.E.2d 17.) Accordingly, the defendant has failed to demonstrate that he was denied effective assistance of counsel.

The defendant next argues that the trial court erred by failing to instruct the jury *sua sponte* concerning the lesser offense of voluntary manslaughter.

Where there is any evidence in a murder case which, if believed by the jury, would support a verdict of manslaughter, but the defendant does not request a manslaughter instruction, it is within the trial court's discretion whether or not to give such an instruction. (*People v. Taylor* (1967), 36 Ill. 2d 483, 487-89, 224 N.E.2d 266.) While we do not believe that the court abused its discretion in not submitting *sua sponte* a voluntary-manslaughter instruction in view of the evidence presented here, we need not, and do not, decide this issue on that basis. An examination of the record shows that the defendant told the trial court that he had discussed the matter with his attorney and knew he could submit instructions and verdicts other than those for guilty and not guilty of murder, but that he did not wish to do so. The assistant State's Attorney also informed the court, as noted earlier, that he had discussed the matter with the defendant's attorney and had offered to type any instructions that the defendant wished, but had been informed by counsel that the defendant only wanted murder instructions, with an instruction also to be given on self-defense. Defense counsel told the trial court that he had no objection to the tendered instructions. Furthermore, the record of the defendant's hearing reveals that, contrary to the defendant's assertions now in his brief, the defendant and his attorney were well aware of the ramifications of the decision to submit instructions for murder only at the

time of his trial. In recalling what transpired at the time of the trial, the judge reminded defense counsel that he had asked him:

"Whether or not you wanted an instruction for voluntary manslaughter or involuntary manslaughter and you said no and I asked you whether you discussed this with your client, Mr. Sowinski, and you said that you had and I asked you whether he understood the implication of what the penalties for murder, vis-a-vis manslaughter were and you said that he had, and going the extra mile and in trying to be as good a judge as I know how to be, I asked Mr. Sowinski to come into my chambers and on the record I asked him those same questions, is that not so, Mr. Sowinski?"

It would appear here that the defendant did not want the jury to consider a "compromise" verdict, but instead chose to submit an "all or nothing" murder instruction, with the added instruction for self-defense. In view of the fact that the decision by the defendant not to have the voluntary-manslaughter instruction given seems very well to have been part of the defense strategy, it would clearly have been improper for the trial court to have *sua sponte* given the instruction and, thus, risked the possibility of interrupting defense counsel's strategy. (See *People v. Precup* (1978), 73 Ill. 2d 7, 17, 382 N.E.2d 227; *People v. Spataro* (1978), 67 Ill. App. 3d 69, 74-75, 384 N.E.2d 553.) Accordingly, we find that the trial court did not abuse its discretion by failing to tender, *sua sponte*, an instruction on voluntary manslaughter.

■■ ■ The defendant finally contends that the trial court abused its discretion in determining his sentence.

The Unified Code of Corrections provides that a person convicted of murder shall receive a sentence of imprisonment for a term of not less than 20 years and not more than 40 years. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(a).) In sentencing the defendant to imprisonment for a term of 25 years, the trial court here added five years to the minimum sentence of 20 years, one year for each month that, in the judge's words, "the family of Timothy George were left to conjecture, to worry, to agonize as to what happened to their son." The defendant here argues that the trial court erred in considering as a sentencing factor this impact on the victim's family, and therefore, his sentence should be reduced.

Sentencing is largely a matter of judicial discretion. (*People v. Kloiber* (1981), 95 Ill. App. 3d 1061, 1071, 420 N.E.2d 870.) The trial court's decision regarding the sentence imposed is entitled to great deference and weight, and a rebuttable presumption exists that the

sentence imposed is a proper one. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) A decision as to the proper sentence to be imposed must be based upon the particular circumstances presented in each case (*People v. Reese* (1984), 121 Ill. App. 3d 977, 989, 460 N.E.2d 446), and in determining sentence, the trial court should consider such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, age, prior conviction record, and the nature and circumstances of the offense for which the defendant is being sentenced. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882; *People v. Kloiber* (1981), 95 Ill. App. 3d 1061, 1071, 420 N.E.2d 870.) This court has also held that "[a] penitent attitude on the part of a defendant, or its absence, are among those factors which a court may evaluate at sentencing." *People v. Davis* (1981), 93 Ill. App. 3d 187, 195, 416 N.E.2d 1179.

In imposing sentence here, the trial judge noted on the record that he had considered the presentence report, the evidence in mitigation and aggravation, and that he had afforded the defendant the opportunity to make a statement in his own behalf. In sentencing the defendant the trial judge stated that he was imposing an additional five years because of the defendant's insensitivity and apparent lack of remorse, with its resultant impact on the victim's family. However, we do not find that the trial court here erred in adding the five years to the defendant's sentence. The fact that the defendant never came forward for nearly five months indicates a lack of a "penitent spirit," a factor clearly appropriate for consideration by the trial court in imposing sentence. (*People v. Morgan* (1974), 59 Ill. 2d 276, 282, 319 N.E.2d 764; *People v. Davis* (1981), 93 Ill. App. 3d 187, 195, 416 N.E.2d 1179.) Thus, we cannot say that the trial court abused its discretion, and, accordingly, there is no basis to alter the sentence imposed. See *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.

For the foregoing reasons, the defendant's conviction and sentence are affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.