THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TOMMY G. FLOYD, Defendant-Appellant.

Fifth District   No. 5—86—0040

Opinion filed September 2, 1987.—Rehearing denied September 29, 1987.

Daniel M. Kirwan and Lori J. Lanciani, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Thomas Sutton, State's Attorney, of Carmi (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE KARNS delivered the opinion of the court:

Defendant, Tommy G. Floyd, was convicted by a jury of the murder of his wife, Avinelle Floyd, and sentenced to 30 years' imprisonment by the circuit court of White County. In a previous disposition, we reversed defendant's conviction and remanded the cause for retrial. (See *People v. Floyd* (1983), 117 Ill. App. 3d 168, 453 N.E.2d 30, *aff'd* (1984), 103 Ill. 2d 541, 470 N.E.2d 293.) On retrial, defendant was again convicted of murder in a jury trial and sentenced to 30 years' imprisonment. Defendant now appeals from his reconviction. We affirm.

On May 31, 1980, the office of the sheriff of White County received a report that an abandoned car believed to be owned by Avinelle Floyd was parked near Grindstone Creek Bridge. The sheriff and the two men who reported seeing the car went to the area and found Mrs. Floyd's body face down in the water underneath the bridge. Her jeans were down between her ankles and knees and her jean jacket and sweater were above her waist. According to the doctor who performed the autopsy, the cause of death was drowning.

Defendant initially denied any involvement in the death of his wife. He told the authorities, along with family and friends, that on the night before Mrs. Floyd's body was found, he and his wife were returning from a tavern. When defendant started "playing around" with her, she stopped the car and ordered him out. Defendant proceeded to walk home on his own. Mrs. Floyd was not there when he arrived. When she still had not returned the following day, defendant told everyone they had had a fight and that she would come home when she was ready. Defendant, however, agreed to help others look for her. Shortly after they stopped searching, defendant was informed by the sheriff that his wife's body had been found.

Ten days later, defendant admitted his involvement in Mrs. Floyd's death. His story was essentially the same up to the point of the drive home. Defendant stated that earlier that day, he had been working on his wife's car. After he finished the repairs, defendant suggested they test drive it. Once on the road, the two drove to Shawneetown and stopped at a bar. Mrs. Floyd had a beer and defendant had a glass of grapefruit juice. Because Mrs. Floyd wanted to hear a band, they drove on to the Levee Tavern, also in Shaw-

neetown. There the two danced several dances and continued drinking beer and grapefruit juice. The Floyds left the tavern between 10 and 11 p.m. that evening. Once in the car, defendant tried to persuade her to have sexual relations with him but she refused. On the way to pick up the school bus she was to drive the next morning, Mrs. Floyd informed defendant she needed to urinate. Defendant turned onto a gravel road and stopped the car on Grindstone Creek Bridge. Mrs. Floyd got out and went to the rear of the car to go to the bathroom. Defendant followed her and, as she was trying to get dressed, again attempted to have sexual relations with her. In their struggles, they moved from the rear of the car to the driver's door. Defendant stated he did not know whether he hit her, struck her or grabbed her, but somehow they both fell off the bridge into the creek. The bridge had no guardrails. Defendant landed slightly to the north of Mrs. Floyd, who was lying face down in the water. Defendant jumped up, climbed out of the creek, shut the car door and proceeded to walk home. He did not look to see if his wife was dead or alive. Defendant later told the authorities that he may have held Mrs. Floyd by the back of the neck in the water but that he was only trying to get her to come to him. He also informed them that he was able to see bubbles coming up from around her head as he was leaving the creek. The next day, defendant, during another interview, stated that, "I keep thinking I held her head under, but I didn't mean to hold it under too long." After defendant was informed there was a possibility that bond would not be allowed, he responded, "I did it. You guys know I did it. I need to get out and see about the kids." At trial, defendant repeated essentially the same story but added that he fell on top and just to the north of his wife. After he got up out of the water, he did not see his wife move at all. He turned her around in the water, but she still did not move. He panicked and got out of the creek and walked home. After he returned home he drove to the garage to see if his wife had picked up her school bus yet. Once he realized she had not, he then threw his wet clothes into the Wabash River because they reminded him of what happened and later threw his boots in a garbage pile at work. Defendant testified he loved his wife and that he did not intentionally cause her to fall from the bridge or cause her head to be kept under water.

Other testimony at defendant's trial revealed that the Floyds were in the process of getting a divorce. Mrs. Floyd had filed a petition for dissolution of marriage 10 days prior to her death. The two had, however, already reached a settlement agreement as to the division of their property and the custody and visitation of their children.

Additional evidence revealed the Floyds were also experiencing financial difficulty prior to Mrs. Floyd's death. The second mortgage on their property already was in default and they had an additional one-year note due in May. After Mrs. Floyd's death, all loans and mortgages were paid in full through mortgage life insurance proceeds.

Defendant argues on appeal the State failed to prove beyond a reasonable doubt the mental state required to sustain his conviction. We disagree.

■ ■ Section 9—1(a)(2) of the Criminal Code of 1961 states: "A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death: *** (2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another ***." (Ill. Rev. Stat. 1979, ch. 38, par. 9—1.) There is no dispute that defendant's actions caused the death of his wife. The only issue is his intent. The State, however, need not prove defendant had the intent to murder; the State need only show that defendant voluntarily and willfully committed an act, the natural tendency of which was to cause death or great bodily harm. (See *People v. Whitt* (1986), 140 Ill. App. 3d 42, 50, 487 N.E.2d 1246, 1251; *People v. Steffens* (1985), 131 Ill. App. 3d 141, 148, 475 N.E.2d 606, 612-13.) This intent may be implied or inferred from the surrounding facts and circumstances, including defendant's words and actions, and from the character of the acts themselves. *People v. Whitt* (1986), 140 Ill. App. 3d 42, 50, 487 N.E.2d 1246, 1251; *People v. Steffens* (1985), 131 Ill. App. 3d 141, 148-49, 475 N.E.2d 606, 612-13.

Mrs. Floyd's body was found face down in approximately two feet of water. The autopsy revealed the cause of death was drowning. On the average, when a person's nose and mouth are submerged beneath water, unconsciousness results after approximately two minutes, brain death after five, and complete death after 10 minutes. None of the lacerations, abrasions or contusions on Mrs. Floyd's body were serious enough to have caused her death or rendered her unconscious upon entering the water. The pathologist who performed the autopsy testified Mrs. Floyd probably was conscious when she was first in the water and that the act of holding her head under water would be consistent with her death. Defendant claims her death was an accident, that he fell on top of her and she did not move. Defendant, however, could not have stayed on top of his wife in the water long enough to render her unconscious without deliberately holding her down, even if either were shocked or stunned temporarily from their fall. Moreover, defendant testified that he jumped up immediately. He did not pull his

wife's face out of the water; he did not pull her up on the bank. He did nothing to check for any signs of life. Instead, he got out of the creek, picked up his belongings, shut the door of her car, and walked home. Instead of jumping in her car and getting assistance, defendant simply left. When asked about her whereabouts the next day, he denied any knowledge. And on his way to work, defendant disposed of the clothing he was wearing that night.

Defendant further testified he saw bubbles coming up around Mrs. Floyd's head as he was leaving the creek. There are, however, no lights at the bridge. And, on the night of Mrs. Floyd's death, it had been raining and defendant already had turned off the car headlights before following his wife to the rear of the car. When the rescue workers found Mrs. Floyd's body the following evening, they had to use car headlights and flashlights to see under the bridge. Defendant could not have seen bubbles around his wife's head as he pulled himself out of the creek. More than likely, defendant felt or heard bubbles while holding her head under water. The fact that Mrs. Floyd suffered a laceration behind her left ear while defendant displayed a torn thumbnail, in addition to the presence of sand under Mrs. Floyd's fingernails, also give credence to the inference defendant deliberately held his wife's head under the water.

The jury, as judge of the credibility of witnesses, is not required to believe defendant's exculpatory testimony. (*People v. Cox* (1984), 121 Ill. App. 3d 118, 123, 459 N.E.2d 269, 272, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 296, 105 S. Ct. 360.) The physical and medical evidence clearly does not support defendant's version of Mrs. Floyd's death. Moreover, all of defendant's actions subsequent to her death, flight from the scene, destruction of evidence, and his first false exculpatory story, demonstrate a consciousness of guilt. (See *People v. Watson* (1982), 103 Ill. App. 3d 992, 995, 431 N.E.2d 1350, 1353; *People v. Kradenych* (1980), 83 Ill. App. 3d 547, 552-53, 404 N.E.2d 488, 493.) Defendant's own statements, however, are the most convincing direct evidence of his voluntarily and willfully committing an act leading to the death of his wife. Defendant first told the authorities after admitting his involvement in Mrs. Floyd's death that he may have had her by the back of the neck in the water but that he was only trying to get her to come to him. Death or great bodily harm would certainly be the natural consequence of holding a person's head under water in order to force her to perform an act unwillingly. Defendant next told the authorities that he held his wife's head under the water but he did not mean to hold it under too long. Finally he stated, "I did it. You guys know I did it ***." When asked by a friend

why he left his wife's car on the bridge, he answered he wanted the authorities to find her. "I could have took the car and run it off in the backwater or hid it, *** no telling when they would have found her." Defendant's statements and actions certainly support the jury's verdict.

■ Mrs. Floyd died of drowning. Defendant was the only other person in the water with her. The evidence clearly supports the jury's verdict that defendant held her head under water knowing that such act created a strong probability of death or great bodily harm. Defendant was proved guilty beyond a reasonable doubt of the murder of his wife, Avinelle Floyd. See *People v. Steffens* (1985), 131 Ill. App. 3d 141, 147-49, 475 N.E.2d 606, 612-13.

■ Defendant next argues that the introduction of a transcript of the testimony of a witness who testified in the first trial violated defendant's right of confrontation because the State failed to show due diligence in attempting to locate the witness for the second trial. We need not determine whether the State exercised due diligence because defense counsel failed to include this in a timely motion for a new trial. Failure to include an issue in a timely post-trial motion constitutes a waiver of that issue. (*People v. Caballero* (1984), 102 Ill. 2d 23, 31, 464 N.E.2d 223, 227, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362.) Furthermore, we do not believe that the "plain error" doctrine should be applied here, as defendant urges, because it is not plainly apparent from the record that an error affecting substantial rights was committed. (See *People v. Friesland* (1985), 109 Ill. 2d 369, 374-76, 488 N.E.2d 261, 262-64; *People v. Precup* (1978), 73 Ill. 2d 7, 17, 382 N.E.2d 227, 231.) The substance of the testimony of the witness in question was merely cumulative of the testimony of other witnesses and, given defendant's inculpatory statements, the evidence could not be said to be closely balanced.

■ Defendant further maintains that the failure to file a timely post-trial motion was a result of defense counsel's ineffectiveness. Because we believe that the outcome of the proceedings would not have been different had the testimony in question not been admitted, failure to include this argument in a timely motion for a new trial did not constitute ineffective assistance of counsel. Given the nature and substance of the testimony in question relative to the other evidence, even if the trial court had erred in admitting it, the error would have been harmless.

■ Defendant also contends on appeal that the trial court erred in failing to submit the second paragraph of Illinois Pattern Jury Instructions, Criminal, No. 3.02 (2d ed. 1981), the circumstantial evi-

dence instruction, to the jury as the evidence was entirely circumstantial. Without addressing whether the evidence was entirely circumstantial, we note that in *People v. Bryant* (1986), 113 Ill. 2d 497, 499 N.E.2d 413, our supreme court held that the second paragraph of the circumstantial evidence instruction was obscure and misleading and should no longer be used. (113 Ill. 2d 497, 507-12, 499 N.E.2d 413, 419-20.) As *Bryant* was the prevailing rule at the time this appeal was filed, it is dispositive of this issue. We can find no error in the trial court's failure to give the second part of the instruction.

■■ Finally, defendant contends that the trial court erred in considering the fact that he inflicted or attempted to inflict serious bodily harm or injury to his wife as a factor in aggravation.

Section 5—5—3.2(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)(1)) provides that a sentencing court may, in imposing a term of imprisonment, consider as a factor in aggravation the fact that the defendant's conduct caused or threatened serious harm. This allows a sentencing court to impose a more severe sentence, within the range provided for the crime in question, for those defendants whose conduct is more reprehensible. Defendant argues that because bodily harm is implicit in every murder it should not be considered as an aggravating circumstance.

Defendant relies on *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, a case decided subsequent to the imposition of defendant's sentence. In *Saldivar*, the defendant was convicted of voluntary manslaughter and sentenced to seven years' imprisonment. Relying on the reasoning of *People v. Hughes* (1982), 109 Ill. App. 3d 352, 440 N.E.2d 432, and *People v. Andrews* (1982), 105 Ill. App. 3d 1109, 435 N.E.2d 706, our supreme court held that

"in sentencing a defendant on a conviction for voluntary manslaughter it is permissible for the trial court, in applying the statutory aggravating factor that the defendant's conduct caused serious harm to the victim, to consider the force employed and the physical manner in which the victim's death was brought about." (*People v. Saldivar* (1986), 113 Ill. 2d 256, 271, 497 N.E.2d 1138, 1144.)

Applying that test to the facts, the supreme court determined that the trial court improperly relied on the aggravating factor. The court focused not on the degree of harm or the gravity of the defendant's conduct, but on the end result, that is, the victim's death, a factor which is implicit in the crime of voluntary manslaughter and which could not, therefore, be considered as a factor in aggravation. (*Cf. People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906.) Here, how-

ever, the trial court did not focus on the death of Mrs. Floyd when applying the statutory aggravation factor, but on the harm done to her in causing her death. The record indicates that the trial court's focus was on the gravity of defendant's conduct, *i.e.*, the force employed and the physical manner in which his wife's death was brought about, factors clearly permissible under our decisions in *Hughes* and *Andrews*, and under our supreme court's later decision in *Saldivar*.

Defendant also contends that the trial court erred in considering that his sentence was necessary to deter others from committing similar crimes. Section 5—5—3.2(a)(7) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)(7)) provides that a sentencing court may consider as a reason to impose a more severe sentence the fact that the sentence is necessary to deter others from committing the same crime. In *People v. Thomas* (1979), 76 Ill. App. 3d 969, 395 N.E.2d 601, on which the defendant relies, we questioned the validity of deterrence as an aggravating factor. (76 Ill. App. 3d 969, 976, 395 N.E.2d 601, 605-06.) But as we pointed out in *People v. Simmons* (1985), 138 Ill. App. 3d 492, 485 N.E.2d 1135, *Thomas* stands for the proposition that "deterrence of others could not be used to deny *probation* where deterrence was the *sole* aggravating factor." (138 Ill. App. 3d 492, 501, 485 N.E.2d 1135, 1142.) This is not the situation in this instance. Probation could not be considered and other significant aggravating factors were clearly present. Therefore, the trial court committed no error in considering deterrence as a reason to impose a more severe sentence in this case.

The trial court also considered as a factor in aggravation the fact that "[h]e [defendant] appears to be a fairly intelligent person, somewhat articulate." As the trial court stated, "[I]t's difficult to realize how a person of these capabilities and mental capacities could walk away from a factual situation as heard by the court during the course of the trial." While Section 5—5—3.2(a) does not specifically mention individual circumstances of a defendant as a factor in aggravation, the list of aggravating factors found in that section is not exclusive. When considering aggravating or mitigating factors in imposing sentence, a trial court may properly consider nonstatutory aggravating factors. *People v. Zehr* (1986), 143 Ill. App. 3d 875, 879, 493 N.E.2d 727, 729; *People v. Allen* (1983) 119 Ill. App. 3d 845, 846, 457 N.E.2d 77, 78.

In comparing the various factors in aggravation and mitigation, we find that the trial court's decision to sentence the defendant to 10 years in excess of the minimum was both reasonable and justified, and not an abuse of discretion. See *People v. Perruquet* (1977), 68 Ill.

2d 149, 368 N.E.2d 882.

For the above mentioned reasons, we affirm the judgment of the circuit court of White County.

Affirmed.

HARRISON and WELCH, JJ., concur.