THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHARLES BUDDY SULLIVAN, Defendant-Appellant.

Fifth District   No. 5—87—0361

Opinion filed May 18, 1989.

Daniel M. Kirwan and Edwin J. Anderson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Charles Garnati, State's Attorney, of Marion (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RARICK delivered the opinion of the court:

Defendant, Charles "Buddy" Sullivan, was convicted after a jury trial of the murder of Ronald Hicks, defendant's next door neighbor and best friend, and sentenced by the circuit court of Williamson County to natural life imprisonment.

On July 2, 1985, Hicks disappeared. His body was found four months later next to a pond near an abandoned farmhouse in Williamson County. Hicks apparently had been shot to death. His wallet was discovered some distance from the body. Eventually the police learned defendant and his girlfriend, Myla Jean Ring, were connected with the murder.

According to Ring, she and defendant had been dating for some time prior to Hicks' murder. Ring, then age 18, and defendant, 45, developed a rather intense sexual relationship. Ring claimed defendant was very demanding, violent and jealous, but she loved him and

wanted to marry him. Defendant, however, did not want to make such a commitment, having recently been divorced.

At one point in the relationship, Ring went to Florida with some of her friends. Upon returning, Ring found defendant to be very angry and distant with her. She decided she would try to win defendant back by making him jealous. She asked Hicks out for a date and had sexual contact with him on May 28, 1985. Ring told defendant the next day about her date with Hicks. After defendant learned from Hicks the extent of his and Ring's encounter, defendant became very depressed. Ring claimed defendant eventually determined he had to get rid of Hicks because of what he had done with his girlfriend. Defendant devised an elaborate plan whereby Ring would lure Hicks out to a deserted farmhouse and then kill him. The plan went according to schedule. Ring enticed Hicks out to the farmhouse on the pretext of repeating their earlier sexual encounter. As they were walking around, defendant appeared. They explained to Hicks that Ring was needed back at defendant's business. As the three of them began walking back to their vehicles, Ring claimed she needed to relieve herself. She asked defendant to hold her purse, in which they previously had hidden a gun. Defendant took out the gun and shot Hicks in the back. Hicks began running, while pleading for his life. Defendant followed him. Ring saw Hicks fall, heard more shots, and then proceeded back to Hicks' truck. She donned a wig and glasses and drove the truck back to town. After dropping it off, she hid in a ditch beside the highway and waited for defendant. Eventually, defendant picked her up and took the wig, glasses and Ring's clothes to burn. Defendant and Ring continued to date, but defendant still refused to marry her. She eventually decided to get away from defendant and began dating his brother. Defendant again became very jealous and tried to stop them from seeing each other. Defendant met with Ring's mother and told her that her daughter had killed Hicks. Ring's mother informed the police of defendant's story, and Ring turned herself in a few days later. She originally told the police she shot Hicks, but later informed them defendant killed Hicks while she watched. She told the police she originally lied because defendant asked her to do so and had finally promised to marry her. When she later learned defendant was not being honest with her, she decided to tell the police the truth.

Defendant's version naturally differed from that of Ring's. He denied any participation in the killing whatsoever. According to defendant, he was Ring's "sex slave." He learned about Hicks' murder the day after it occurred and kept quiet because of her threats to implicate him. Defendant contended Ring killed Hicks because he had

raped her. Defendant also claimed he was not bothered by Ring's earlier date with Hicks because he knew she was very active sexually with many men. Defendant also stated he called Ring's mother out of fear for his brother's safety. The jury chose to believe Ring's version and found defendant guilty of murder. Defendant appeals both his conviction and sentence. We affirm.

Defendant argues on appeal that he was not proved guilty beyond a reasonable doubt of Hicks' murder because Ring's testimony did not create an abiding conviction of his guilt. Defendant believes Ring's testimony was not credible, as it served to exculpate her of guilt for a murder she already confessed to committing. We disagree.

■■■■ The uncorroborated testimony of an accomplice is sufficient to sustain a conviction if such testimony satisfies the jury of a defendant's guilt beyond a reasonable doubt. (See *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277; *People v. Newell* (1984), 103 Ill. 2d 465, 469-70, 469 N.E.2d 1375, 1377.) While it is true that in general such testimony may be fraught with serious weaknesses and should be accepted only with the utmost caution and suspicion (see *Newell*, 103 Ill. 2d at 470, 469 N.E.2d at 1377; *People v. Hermens* (1955), 5 Ill. 2d 277, 285, 125 N.E.2d 500, 504-05), defendant refuses to acknowledge that the accomplice testimony in this instance is corroborated. Material corroboration under such circumstances is entitled to considerable weight. *Hermens*, 5 Ill. 2d at 286, 125 N.E.2d at 505.

The evidence revealed that defendant exercised considerable control over Ring. She cooked and cleaned for him, took care of his children when they visited, helped out with defendant's business, and paid for his food and beer with the money her parents gave her. Over time defendant became very jealous and possessive of Ring. One instance when he thought Ring was going to meet another man, defendant smashed her fingers on the window sill and on another occasion twisted her arm to such an extent that she required medical attention. Defendant's ex-wife also testified to defendant's jealous and somewhat violent nature.

Shortly after Ring was arrested and had confessed to the murder, she agreed to reenact the crime on video tape. Ring was not able to show the officers where Hicks fell. The officers had to point out for her where the body was found, and for the first time Ring learned of the existence of a pond near the scene. The pond was not visible from the point at which she stopped to go to the bathroom because of a small crest in the field. In addition, Ring could not remember the number of times she shot Hicks, and she also told them she did not remove his wallet from his pants. Ring seemed sure of what she had

done up to the point of stopping to feign going to the bathroom and from there on appeared to be groping.

The corroborating evidence does not end here. Upon searching defendant's house, the police confiscated a footlocker which contained the wig and eyeglasses Ring allegedly wore while driving Hicks' truck back to town. A .22 caliber bullet similar to the type used to kill Hicks was also found at the bottom of the footlocker. In one of defendant's notebooks, next to the date Ring went out with Hicks, was written "Black Day." And, drafts of letters reveal defendant's jealousy toward Ring dating his brother. In addition, Ring's personal property bag at the jail contained a set of matching wedding and engagement rings. One of Ring's cellmates also testified she overheard defendant trying to convince Ring to lie for him. The story defendant wished Ring to tell was the same one he told the police.

It is also important to note that Ring's second version of the events remained constant. And, the relating of this second version occurred approximately 1½ months prior to her plea agreement. Finally, Ring had no motive for killing Hicks.

■■ ■ Viewing all of the evidence in the light most favorable to the prosecution, it is more than sufficient to support the jury's verdict. It is not our function to retry defendant. (See *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.) The resolution of defendant's guilt or innocence depended primarily on the credibility of the witnesses and the weight given their testimony. It was for the jury to resolve any conflicts in the evidence (*Collins*, 106 Ill. 2d at 262, 478 N.E.2d at 277), and the jury obviously chose to believe Ring's account of the crime. The jury simply was not required to believe defendant's exculpatory testimony. See *People v. Floyd* (1987), 160 Ill. App. 3d 80, 85, 512 N.E.2d 1378, 1382.

We note the jury was fully cognizant of the infirmities in Ring's testimony and of the agreement she made in exchange for her testimony. The jury was aware of a possible motive for implicating defendant in order to save herself and accordingly was instructed that accomplice testimony should be viewed with suspicion. The jury still chose to believe Ring, and after reviewing the record, we cannot say the jury's conclusion is unreasonable. See *Collins*, 106 Ill. 2d at 262, 478 N.E.2d at 277. *Cf. People v. Williams* (1976), 65 Ill. 2d 258, 357 N.E.2d 525; *People v. Savory* (1978), 62 Ill. App. 3d 750, 379 N.E.2d 372.

Defendant also argues on appeal that his sentence must be reversed because the trial court improperly considered his post-crime behavior toward Hicks' family and ignored his potential for rehabilita-

tion. Again we disagree.

■ The determination and imposition of any sentence is a matter involving considerable judicial discretion, and absent an abuse of that discretion, we will not alter the sentence upon review. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492, 431 N.E.2d 344, 348; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883.) The trial judge, having had the opportunity to evaluate all of the facts and observe the defendant throughout the course of his trial and sentencing hearing, naturally is in a better position to determine the punishment to be imposed based upon the particular circumstances of that defendant's case. (*Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.) Such a judgment depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. *Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.

■ Turning to defendant's sentence, the trial court may impose a sentence of natural life imprisonment for murder if the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty (see Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)). The evidence here clearly established such behavior. Defendant carried out a premeditated, cold-blooded murder and placed most of the risk on Ring. He shot Hicks in the back several times while ignoring all pleas for mercy. After the murder, he maintained contact with Hicks' family and said nothing. Only when Ring began dating his brother, approximately one year later, did defendant reveal that he had information concerning the murder. The murder was both cruel and wanton, and defendant exhibited no remorse or pity whatsoever. A lack of "penitent spirit" is but one factor a trial court properly may consider in determining wanton cruelty. (See *People v. Sowinski* (1986), 148 Ill. App. 3d 231, 248, 498 N.E.2d 650, 660; *People v. Nester* (1984), 123 Ill. App. 3d 501, 506, 462 N.E.2d 1011, 1015.) The trial court must consider *all* factors and *all* facts surrounding the incident in question in evaluating the heinousness of a defendant's conduct. See *Nester*, 123 Ill. App. 3d at 504-05, 462 N.E.2d at 1014.

■ These same facts and factors also support the trial court's conclusion that defendant exhibited little, if any, potential for rehabilitation. While defendant has attained a high degree of education and has little prior history of criminal activity, he also exhibited repeatedly a very jealous, violent nature. Furthermore, defendant's numerous writings were bizzare and revealed no remorse. The trial court concluded that if the situation were to arise again, defendant in all probability would kill in cold blood again. We find no basis in the record to

dispute this conclusion.

It is not our function to serve as a sentencing court and substitute our judgment for that of the trial court merely because we might have balanced the appropriate factors differently. (*People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541, 547; *Perruquet*, 68 Ill. 2d at 156, 368 N.E.2d at 885.) Consequently, we find no error in sentencing defendant to natural life. *Floyd*, 160 Ill. App. 3d at 88, 512 N.E.2d at 1384; *Sowinski*, 148 Ill. App. 3d at 248, 498 N.E.2d at 660; *People v. Barkauskas* (1986), 147 Ill. App. 3d 360, 373, 497 N.E.2d 1183, 1192.

For the reasons given above, we affirm the judgment of the circuit court of Williamson County.

Affirmed.

CHAPMAN and GOLDENHERSH, JJ., concur.